566 So.2d 1114 (1990)
Sandra Arleen STEIN, Individually and Sandra Arleen Stein and Steven R. Stein, as Natural Tutors of the Minor Child, Emily Mae Stein, Appellants,
v.
INSURANCE CORPORATION OF AMERICA, et al., Appellees.
No. 21662-CA.
Court of Appeal of Louisiana, Second Circuit.
August 22, 1990.
Writ Denied November 26, 1990.
*1115 Jack H. Kaplan, Shreveport, for appellants.
Mayer, Smith & Roberts by Alex F. Smith, Jr., Shreveport, for appellees.
Before NORRIS, LINDSAY and HIGHTOWER, JJ.
NORRIS, Judge.
Plaintiffs, Steven and Sandra Stein, appeal a judgment in favor of Drs. Dale Bauman and John Waterfallen, and their insurer, Insurance Corporation of America, contending the jury erred in not finding the doctors guilty of medical malpractice in the prenatal care and delivery of their daughter, Emily, in 1982. Finding no manifest or clear error, we affirm.

FACTS
On April 13, 1982, Mrs. Stein consulted Drs. Bauman and Waterfallen, specialists in obstetrics and gynecology, and arranged for them to provide prenatal care and to deliver her baby. Drs. Bauman and Waterfallen were partners at the time.
At the initial visit, Dr. Bauman obtained a medical history of Mrs. Stein's first birth, which had been less than a year before, in July 1981. At that time she delivered an 8 lb. 12 oz. baby girl at full term with no major complications. She had gained 43 lbs. during that pregnancy and was in labor for 17 hours. There was, however, nothing to cause concern except for some bleeding early in the term. Now, at age 25, Mrs. Stein's normal weight was 130 lbs. Dr. Bauman performed a urine test, weighed her at 141 lbs. and determined she was about three months pregnant. He observed no major risk factors in this pregnancy. He estimated her due date at October 24.
Mrs. Stein returned on April 27. Her weight was 145 lbs. and her gestational age was estimated at 14 weeks. On May 23, Dr. Bauman measured the fundal height of the uterus at 18 centimeters. He also ran a sonogram, a device that uses ultrasound to project an image, to ascertain the gestational age of the fetus. The test revealed a gestational age of 17 weeks and one day.
Dr. Bauman saw Mrs. Stein several times in the next four months. By September 10, at 34 weeks gestation, Mrs. Stein weighed 168 lbs. and the fundal height of the uterus was 35 cm. On October 1, Dr. Bauman noted that the fetus's head was floating out of the pelvis, which means it had not dropped into the pelvic cavity.
Dr. Waterfallen examined Mrs. Stein the next three times in October. He found no risk factors in her pregnancy and that the fetus's head was still floating. On October 28, Dr. Bauman examined Mrs. Stein and reported that the fetus was beginning to *1116 drop into the pelvic cavity. By this time, Mrs. Stein weighed 172 lbs. and the gestational age of the fetus was 41 weeks.
On November 5, after 42 weeks of gestation, Mrs. Stein asked that labor be induced. She was concerned about the length of pregnancy and the weight of the fetus. She weighed 174 lbs. and the fundal height of the uterus was 45 cm. Dr. Bauman examined her and noted that the fetus's head was still floating but that it was "presenting." He saw no reason to suspect that this infant was significantly larger than her first. He believed that although the uterus appeared extremely large, this was the result of excess fluid and not an abnormally large baby. He scheduled an induction for labor for November 8.
On November 8, at approximately 6:00 a.m., Mrs. Stein checked into Schumpert Hospital. At 7:30 a.m., pitocin was administered to induce labor. At 9:30 and 11:00 a.m., the nurse increased the pitocin. Dr. Bauman checked on Mrs. Stein twice in the morning and performed a pelvic examination. At approximately 12:00 noon, Mrs. Stein was taken to the delivery room and Dr. Bauman performed an amniotomy, the artificial rupture of the membranes to drain amniotic fluid from the uterus. This allowed the fetus's head to drop into the pelvic cavity. At 1:00 p.m., Mrs. Stein was given an epidural anesthesia.
The second stage of labor began at 2:00 p.m. when Mrs. Stein was completely dilated at 10 cm. Dr. Bauman repeatedly urged Mrs. Stein to push harder. Two nurses applied fundal pressure at the top of the abdomen. Eventually the baby's head began to emerge. Dr. Bauman tried to place forceps on the baby's head to help pull it out, but could not get a satisfactory grip. He cut a third degree episiotomy to open the womb to help get the head delivered. After more fundal pressure, Dr. Bauman again applied the forceps and was successful in getting the baby's head out to the neck. At this time, Dr. Bauman realized the baby's right shoulder was lodged above the pubic bone. This occurrence, known as "shoulder dystocia," is a medical emergency requiring immediate delivery. While the baby is in the birth canal, the umbilical cord is totally compressed, cutting off the blood flow; the baby must be delivered within seven minutes before it suffers brain damage or death. Dr. Bauman first attempted to rotate the baby's head. He then used the Woodscrew maneuver by reaching behind the baby's left shoulder and rotating it around. Both procedures were unsuccessful, as the shoulder could not be turned. Finally, the nurse applied superpubic pressure above the pubic bone; this dislodged the right shoulder. The baby was delivered at 2:45 p.m. She weighed 11 lbs. 10 oz. Dr. Bauman made sure the baby was stable and then repaired the episiotomy.
The baby was born with a fractured right clavicle and right rib cage. She also suffered damage to the right brachial plexus nerve which resulted in Erb's Palsy of her right shoulder. Because of this injury, she cannot raise her right arm above her head without difficulty. The condition is permanent.
In November 1983, plaintiffs filed a claim against defendants with the Office of the Commissioner of Insurance. They contended that Drs. Bauman and Waterfallen were negligent in failing to determine the baby's large weight by ultrasound and in failing to determine if Mrs. Stein was a gestational diabetic, a condition which disappears shortly after birth. Pursuant to LSA-R.S. 40:1299.47, a medical review panel was formed to review the case and issue a recommendation. The panel was composed of Dr. Douglas King, Dr. Timothy Hart and Dr. Samuel Burke. On May 27, 1986, the panel rendered an opinion in favor of defendants. It found no deviation below the applicable standard of care and, consequently, no medical malpractice.
On July 28, 1986, plaintiffs filed suit against Drs. Bauman and Waterfallen and their insurer. Other named defendants were dismissed on a peremptory exception of prescription. The case proceeded to a jury trial in April 1989. The expert medical testimony is summarized below. As noted, the jury rendered a verdict in favor of the *1117 defendants and the plaintiffs have appealed.

EXPERT MEDICAL EVIDENCE
Dr. Richard Cursell, an OB-GYN specialist from St. Louis, Missouri, testified on behalf of plaintiffs. After reviewing the records of the delivery, he testified that Dr. Bauman unquestionably performed all of the appropriate maneuvers to deliver the baby once the shoulder dystocia occurred. He conceded that shoulder dystocia is hard to predict. However, he believed that defendants were negligent in their prenatal care in two respects. First, they failed to rule out gestational diabetes with a 50 gram glucose loading test. He said that although Mrs. Stein presented no risk factors for diabetes, he would have given the glucose test because the fetus appeared large. He did not explain the exact nature of this test but said that gestational diabetes would suggest the baby's body was larger than normal, and thus more prone to shoulder dystocia. Second, he felt that Dr. Bauman should have used ultrasound to predict the baby's size and weight. He stated that ultrasound's margin of error in predicting size and weight of the fetus is 10 to 15%. According to Dr. Cursell, if the fetus was determined to be almost 11 lbs., most physicians would have performed a caesarian section. Dr. Cursell testified that a substantial weight gain during pregnancy does not necessarily mean that the baby will be large. According to Dr. Cursell, the course of Mrs. Stein's labor was normal.
Dr. Burke, board certified in OB-GYN, was selected to the medical review panel by the plaintiffs but testified at trial for the defendants, finding no medical malpractice. He testified that there is no accurate method for predicting shoulder dystocia, but a prolonged second stage of labor would be one indication. He stated that in this case Mrs. Stein had a normal labor curve and a slightly short second stage of labor. As for fetal weight, Dr. Burke was not aware of any method to calculate this accurately. He stated he had never used ultrasound to measure fetal size and that this method can only give an estimate of fetal weight. He testified that ultrasound would not have changed Dr. Bauman's decision to proceed with the vaginal delivery. According to Dr. Burke, a doctor does not consider performing a caesarian section based on the size and weight of a baby. He cited the greater risks involved in caesarian sections, including higher mortality rates and infection rates to the mother. Dr. Burke also testified that once the baby's head is out, it is too late for a caesarian section.
Dr. Burke stated that a woman is expected to gain 20 to 30 lbs. during pregnancy. According to Dr. Burke, there is no direct correlation between the weight gain of a mother and the size of the baby; a woman could gain a lot of weight and still have a small baby. He testified that in 1982 it was not accepted medical practice to administer a 50 gram glucose loading test for diabetes unless some risk factor was noted.
Dr. King, board certified in OB-GYN, was selected by defendants to the medical review panel. He found no medical malpractice. He testified that there were no high risk factors of major problems in Mrs. Stein's prenatal record. He stated that a physician cannot predict shoulder dystocia, but that a prolonged first and second stage of labor is an indication. In this case, Mrs. Stein had a normal course of labor. According to Dr. Burke, once shoulder dystocia occurs, a caesarian section is impossible.
Dr. King explained that gestational diabetes can cause excessively large infants. In this case, there was no indication that Mrs. Stein had diabetes. Dr. King stated that it was not standard practice in 1982 to give Mrs. Stein a 50 gram glucose loading test.
According to Dr. King, in 1982 the margin of error for estimating weight by use of ultrasound was 15%. He testified that Mrs. Stein's large weight gain during pregnancy could have been due to excessive amniotic fluid in her uterus.
Dr. Hart was selected to the medical review panel by Drs. King and Burke. He also found no medical malpractice. He has delivered over 2000 babies. He testified *1118 that the diagnosis of shoulder dystocia is not made until the baby's head emerges; it may occur if the mother exhibits a protracted labor pattern. He testified that Mrs. Stein, however, had a rapid transition through the first and second stages of labor. He stated that in some cases of shoulder dystocia, the doctor must fracture the baby's clavicle to deliver it in time.
Dr. Hart testified that ultrasound is not accurate but can be used as a tool to estimate fetal weight. He believed that ultrasound would not have changed Dr. Bauman's management of the delivery. According to Dr. Hart, a 50 gram glucose loading test was not routinely administered in 1982. He noted that Emily was not hyperglycemic after delivery, which indicated that Mrs. Stein was not a gestational diabetic.
Dr. Hart explained that on a second or subsequent pregnancy, the fetus's head may not engage into the pelvis until after labor. He stated that Mrs. Stein's pelvis was adequate for the delivery of the baby.
Dr. Bauman testified that he expected a large baby, but not one as excessively large as Emily. He was aware that second babies tend to be larger than first babies and assumed that Emily would weigh 9 to 9.5 lbs. He testified that there was no way to determine the size of the fetus accurately. According to Dr. Bauman, in 1982 ultrasound could not estimate the size of a large baby. Since 1982, there has been information suggesting it might be of some use in estimating fetal weight. He stated it still gives only a "ballpark figure." Dr. Bauman also stated that the weight gain of the mother does not reliably predict the fetus's weight.
Dr. Bauman testified that the 50 gram glucose loading test for gestational diabetes was not routinely given in 1982. Furthermore, he testified he would not have given the test because she showed no symptoms of gestational diabetes.
According to Dr. Bauman, nothing could have been done to prevent the baby's injuries. He stated that there is no way to predict shoulder dystocia until it occurs. Dr. Bauman recalled a John Hopkins study of babies weighing over 8 lbs. 14 oz. at birth in which only 1.7% developed shoulder dystocia.
Dr. Bauman testified that he would consider a caesarian section if the baby was being harmed by the labor or the progress of labor was abnormal. In this case, Mrs. Stein was progressing very rapidly in labor and Dr. Bauman was afraid he would miss the delivery of the baby; thus, he never considered a caesarian section. Dr. Bauman testified that he did not conduct an x-ray pelvimetry because it does not determine if the baby can get through the pelvis and it exposes the fetus to radiation. The other experts agreed. He stated that in second pregnancies, the fetus's head usually does not engage into the pelvis until labor begins.
Dr. Waterfallen testified that it is difficult to diagnose shoulder dystocia until the baby's head is delivered; a finding that the fetus is large is not adequate to predict the condition. He testified that he has delivered over 2000 babies and only "two or three" had shoulder dystocia.
According to Dr. Waterfallen, ultrasound would have confirmed that the baby was large, but not excessively large, and it would not have changed Dr. Bauman's decision to proceed with vaginal delivery. In this case, ultrasound would not have shown an abnormal shape of the fetus. Furthermore, he stated the margin of error for ultrasound in determining the size and weight of a fetus is 10 to 20%. Dr. Waterfallen stated that ultrasound can only give a "rough estimate" of fetal weight. He believed the best way to determine the size and weight of the fetus is manually in a physical examination.
Dr. Waterfallen testified that there was no evidence that Mrs. Stein was a diabetic. He stated that urine tests for sugar were administered to her "15 or 16 times" and were always negative. Because of these results and the absence of risk factors for diabetes, the 50 gram glucose test was not warranted.
Dr. Waterfallen testified that Mrs. Stein did not have a contracted pelvis. According *1119 to Dr. Waterfallen, a study of shoulder dystocia cases revealed that 7% of the babies die, 20% suffer serious oxygen deprivation and 28% suffer serious problems like Erb's Palsy. He also was aware of the John Hopkins study.
Dr. Clifton Vaughn, a pediatrician, examined Emily immediately after she was born. He detected a fractured right clavicle and right rib cage and damage to the brachial nexus nerve. He tested the baby's blood sugar level and found it normal. According to Dr. Vaughn, a low blood sugar level may have meant the mother was a diabetic.
Dr. Susan Shattuck, a specialist in OBGYN, treated Mrs. Stein from December 1982 through February 1983. She testified that in predicting shoulder dystocia, the fetus's size, and not its weight, is important. She stated that ultrasound can give a "rough estimate" of the size of the fetus. She testified that Dr. Bauman's use of forceps was appropriate.
Lucinda Murray, an occupational therapist, evaluated Emily for the last time in 1987. She testified that there were limitations of motion in Emily's right shoulder and arm and she could not raise her arm above her head without effort. Mrs. Murray stated that this disability was permanent.
Mrs. Sandra Stein, the plaintiff, did not qualify as an expert witness but she is a registered nurse. She testified she became concerned about the baby's size in October and that Dr. Bauman should have calculated its size. However, she never asked Dr. Bauman for a caesarian section. She stated that she had no complications with her first child.
Mrs. Stein testified that Dr. Susan Shattuck told her that she was probably a gestational diabetic. She admitted that she had never been diagnosed as a diabetic and that Emily does not have any symptoms of being born of a diabetic mother. She believed that Dr. Bauman was properly staffed and that she received adequate attention from the nurses.

LAW
In a medical malpractice action against a specialist, the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians within the involved medical specialty and is not restricted to proof of the standard of care and skill within the defendant's community or locality. LSA-R.S. 9:2794 A(1); Douzart v. Jones, 528 So.2d 602 (La.App. 2d Cir.1988). The plaintiff must also prove that the defendant either lacked the degree of knowledge or skill, or failed to use reasonable care and diligence along with his best judgment in the application of that skill; and that as a result injuries were sustained that would not have otherwise occurred. LSA-R.S. 9:2794 A(2), (3).
A physician is not required to exercise the highest degree of care possible. His duty is to exercise the degree of skill ordinarily employed by his professional peers under similiar circumstances. The law does not require absolute precision in medical diagnosis. Acts of professional judgment are evaluated in terms of reasonableness under the circumstances then existing, not in terms of result or in the light of subsequent events. Jackson v. Huang, 514 So.2d 727 (La.App. 2d Cir.1987), writs denied 518 So.2d 1050 and 519 So.2d 119 (La.1988); Matthews v. LSU Medical Center, 467 So.2d 1238 (La.App. 2d Cir.1985).
The standard of knowledge, skill, and care for physicians are best determined from the testimony of other experts in the field. When the medical experts express different views, judgments and opinions on whether the standard of care was met in any given case, the reviewing court will give great deference to a trier of fact's findings. These findings will not be disturbed in the absence of clear error, even if other conclusions from the same evidence are equally reasonable. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Reid v. North Caddo Memorial Hospital, 528 So.2d 653 (La.App. 2d Cir.1988).
On appeal, plaintiffs argue that the jury clearly erred in failing to find that Drs. Bauman and Waterfallen committed medical *1120 malpractice in the prenatal care and delivery of Emily.

USE OF ULTRASOUND
Plaintiffs first contend that the jury erred in not finding medical malpractice in defendant's failure to use ultrasound to predict the fetus's size and weight. Plaintiffs reason that if the defendants had used ultrasound, they may have accurately calculated the size and weight of the fetus and elected to proceed with a caesarian section, which would have averted the baby's injuries.
A brief recapitulation of the expert evidence shows that there is sufficient evidence in the record to support the jury's verdict. Dr. Burke testified that he did not use ultrasound to predict fetal size, adding that a doctor should not base his decision to perform a caesarian section merely on the size and weight of the fetus. Dr. Shattuck stated that ultrasound can give only a "rough estimate" of fetal size. Dr. King testified that in 1982 ultrasound had a margin of error of 15%. Dr. Cursell stated that the margin of error was 10 to 15%. Dr. Hart stated that ultrasound could be 1.5 to 2 lbs. off.
Drs. Burke, Hart, and King testified that defendants' failure to use ultrasound was not a deviation below the expected standard of care. Only Dr. Cursell thought otherwise, but the jury obviously assigned greater weight to the other testimony. On this record, it could reasonably find that the failure to use ultrasound was not beneath the standard of care or even a proximate cause of the baby's injuries. We cannot say the jury was clearly wrong in this finding.

50 GRAM GLUCOSE LOADING TEST
Plaintiffs' second contention is that defendants deviated below the standard of care by failing to administer to Mrs. Stein a 50 gram glucose loading test to determine if she was a gestational diabetic. According to plaintiffs, babies of diabetic mothers tend to have larger bodies, thus increasing the risk of shoulder dystocia.
Drs. Burke, King, and Hart all testified that in 1982 the applicable standard of care did not include administering the 50 gram glucose loading test absent the presence of any high risk factors of diabetes. They testified without contradiction that there were no high risk factors in this case. In fact, defendants regularly administered urine tests to Mrs. Stein and found no indication of gestational diabetes. Furthermore, Dr. Vaughn conducted glucose tests on Emily shortly after birth and found her blood sugar level normal; this indicated that Mrs. Stein was not a gestational diabetic. This strongly suggests that even if the glucose test had been given, as the plaintiffs urge it should, the results would have been negative and would not have alerted the defendants to any potential complications.
There is sufficient expert testimony in the record to support the jury's conclusion that the defendants' failure to administer a 50 gram glucose loading test did not violate the standard of care and was not a proximate cause of the injuries complained of by plaintiffs. Accordingly, the jury's finding was not clearly erroneous.

CONCLUSION
The jury found that plaintiffs did not meet their burden of proof under R.S. 9:2794. Its findings are not manifestly erroneous. For this reason, the judgment is affirmed. Costs are assessed to plaintiffs.
AFFIRMED.