623 So.2d 233 (1993)
Wayne WAINWRIGHT, Plaintiff-Appellant,
v.
Marshall L. LEARY, M.D. and Lammico Insurance Company, Defendants-Appellees.
No. 25036-CA.
Court of Appeal of Louisiana, Second Circuit.
August 18, 1993.
*234 Bruscato & Loomis by Albert E. Loomis, III, Monroe, for plaintiff-appellant.
Hudson, Potts & Bernstein by Gordon L. James, Brady D. King, II, Monroe, for defendants-appellees.
Before MARVIN, SEXTON and STEWART, JJ.
STEWART, Judge.
Plaintiff, Wayne Wainwright, filed a medical malpractice and wrongful death/survivorship action against Dr. Marshall Leary and his insurer, LAMMICO, because Wainwright's wife died from a reaction to medicine which Dr. Leary had prescribed. A 12-person jury found in favor of defendant, Dr. Leary. Wainwright appeals the jury verdict, asserting that it is contrary to the evidence and that the trial court erred in disallowing the testimony of one expert witness. We affirm.

FACTS
Patty Wainwright developed "essential thrombocythemia", a blood disorder in which megakarocytes, a type of bone marrow cell, produce dangerously high levels of platelets. Platelets, white blood cells, and red blood cells are all blood components which are produced in the bone marrow. The platelets are useful in blood clotting and thus in keeping blood from seeping into the body's tissues. Essential thrombocythemia is not curable. Half of those who have this blood disorder die before the end of a ten-year period, and half die after a ten-year period. Patty was diagnosed with this disease as early as May 16, 1983.
Dr. Marshall Leary treated Patty Wainwright for this disorder. On June 20 or 21, Dr. Leary prescribed Busulfan, also known as Myleran. As a result of the Busulfan, less than three months later the death of Patty Wainwright's bone marrow was confirmed. Her bone marrow no longer produced any platelets or white blood cells. In mid-October, she was hospitalized. She died on December 10, 1983 in St. Francis Hospital.
Wayne Wainwright filed suit against Dr. Marshall Leary. His petition for wrongful death and survival action damages alleges that Dr. Leary negligently administered Myleran, also known as Busulfan, to Patty Wainwright. Specifically, Wainwright alleges that Dr. Leary prescribed dosages in excess of those normally prescribed; failed to notify Patty Wainwright of his August 1, 1983 decision that she discontinue use of the Busulfan; and failed to properly monitor and supervise her use of the drug, and to disclose the extreme risks associated with this drug.
After trial, a 12-person jury rendered a verdict in favor of Dr. Leary and against Wainwright. In conformity with the jury verdict, the trial court rendered judgment in favor of defendants, Dr. Leary and his insurer, and dismissed Wainwright's claims against them. Wainwright appeals.

*235 DISCUSSION
Plaintiff-appellant, Wayne Wainwright, asserts that Dr. Leary ignored all known scientific properties of Busulfan and administered it such that it killed Patty Wainwright's bone marrow. Because Dr. Leary frequently changed the dosage of Busulfan/Myleran, he had no opportunity to stop administration of the drug before the platelet count entered the normal range. This, appellant contends, constituted medical malpractice and renders Dr. Leary liable to Wayne Wainwright for damages due to Patty Wainwright's suffering and death.
Defendant-appellees, Dr. Leary and his insurer, contend that Patty's death was due to known side effects of a very potent drug which had to be administered in order to combat her life threatening blood disorder. Appellees contend that Patty died from an idiosyncratic reaction to Busulfani.e., a reaction which occurs in some patients but which is not easily predicted.

Legal Principles

1. General
In a medical malpractice action, the plaintiff must establish by a preponderance of the evidence: (1) that the doctor's treatment fell below the ordinary standard of care expected of a physician in his medical specialty, and (2) the existence of a causal relationship between the alleged negligent treatment and the injury sustained. LSA-R.S. 9:2794; Martin v. East Jefferson General Hosp., 582 So.2d 1272 (La.1991); Smith v. State through DHHR, 523 So.2d 815, 819 (La.1988); Hastings v. Baton Rouge General Hospital, 498 So.2d 713, 723 (La.1987). Resolution of each of these involves a determination of fact which should not be reversed on appeal absent manifest error. Housley v. Cerise, 579 So.2d 973 (La.1991); Smith, supra at 822; Rosell v. ESCO, 549 So.2d 840 (La.1989); Martin, supra.
In Stobart v. State DOTD, 617 So.2d 880, 882 (La.1993), the Louisiana Supreme Court observed that
A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840 (La.1989). This court has announced a two-part test for the reversal of a fact-finder's determinations:
1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). See Mart v. Hill, 505 So.2d 1120, 1127 (La.1987).
This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. Id. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous.
Nevertheless, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the fact-finder's conclusion was a reasonable one.
(Citations omitted and emphasis ours.)
The parties agree that the Busulfan killed Patty's bone marrow and resulted in her death. Thus, at issue is whether the manner in which Dr. Leary administered the Busulfan (1) fell below the applicable standard of care and (2) caused the damages for which Mr. Wainwright seeks relief.
2. Standard of Care
The physician's conduct is evaluated in terms of reasonableness under the circumstances existing when his professional judgment is exercised. The physician will neither be held to a standard of perfection nor evaluated with benefit of hindsight. Opinions from medical experts are necessary to determine both the applicable standard of care, and whether that standard was breached. It is for the trier of fact to evaluate conflicting expert opinions in relation to all the circumstances of the case. Roland v. Tedesco, 616 So.2d 780 (La.App. 2d Cir.1993); Gibson v. Bossier City General Hospital, 594 So.2d 1332 (La.App. 2d Cir.1991); Stein v. Insurance Corp. of America, 566 So.2d 1114 *236 (La.App. 2d Cir.1990), writ denied, 569 So.2d 984 (La.1990); Maxwell v. Soileau, 561 So.2d 1378 (La.App. 2d Cir.1990), writ denied, 567 So.2d 1123 (La.1990).
Where there are contradictory expert opinions concerning compliance with the applicable standard of care, the reviewing court will give great deference to the conclusions of the trier of facts. Bolton v. Louisiana State University Medical Center, 601 So.2d 677 (La.App. 2d Cir.1992); Roland v. Tedesco, supra.

3. Causal Relationship
A medical malpractice plaintiff must show that as a result of the defendant's negligence he suffered injuries that would not otherwise have occurred. Plaintiff need not show that defendant's conduct was the only cause of the harm nor must he negate all other possibilities. Rather, he must show by a preponderance of the evidence, or more probably than not, that he suffered the injury because of defendant's conduct. Maxwell, supra.
Whether there exists a causal relationship, between the alleged negligent treatment and the injury sustained, is a determination of fact which should not be reversed on appeal absent manifest error. Martin, supra.

Testimony and Other Evidence from Medical Experts
Numerous pages of trial transcript and almost seven hours of videotaped depositions reveal that the jury heard evidence which included the following:
In his videotaped deposition which was played for the jury, Dr. Robert A. Figlin, a hematologist and oncologist on the UCLA School of Medicine faculty, noted that Dr. Leary changed the prescribed doses of Busulfan at least five times in a five-week period. It was his opinion that the frequency of the change in the doses was unacceptable. Similarly, Dr. Francis S. Morrison, professor of medicine and director of the division of hematology for the University of Mississippi Medical Center, testified by videotaped deposition that Dr. Leary's methodology of administering the drug did not reflect an awareness of the actions of the drug. Dr. Morrison further testified that Dr. Leary's use of the drug put the patient at an unnecessarily substantial risk of bone marrow aplasia or death of the bone marrow.
By contrast, the report of the medical review panel, signed by three physicians on November 13, 1985, states the following regarding Wainwright's claim against Dr. Leary:
Considering these facts and the evidence, it is the opinion of this panel that the evidence does not support the conclusion that the defendant failed to meet the applicable standard of care as charged in the complaint. There is insufficient evidence submitted that his performance was at variance to accepted proper standards in carrying out the course of treatment followed with this patient.
There is insufficient evidence submitted to support a conclusion that an act of malpractice was committed by Dr. Leary during the course of his treatment of this patient. The medical records and evidence reflect that he was confronted with a patient that suffered from a severe case of essential thrombocytosis. He embarked upon a course of treatment that was consistent with good medical judgment and accepted practices employed by those practicing in his specialty in attempting to control this patient's condition.... This doctor, given this set of circumstances and the condition of this patient, acted responsibly and reasonably in following the course of care pursued with this patient. It cannot be denied that the result of the treatment was unfavorable, but nevertheless, the medicine practiced by this doctor was reasonable and competently carried out by him under the circumstances of this case.
Dr. Darryl Williams, who was a member of the medical review panel, also testified before the jury via videotaped deposition. He stated that it was still his opinion that there is insufficient evidence to support a conclusion that Dr. Leary committed an act of malpractice. Dr. Williams said that total suppression of white blood cell production and platelet *237 production is not an unusual circumstance in any chemotherapy.
The jury also heard the testimony of one of Dr. Leary's former hematology instructors, Dr. Neil Abramson, a hematologist and oncologist who had been on the faculty at Harvard Medical School and had been the program director who began the hematology and oncology fellowship program at the University of Florida in Jacksonville. Dr. Abramson testified that Patty Wainwright's was a severe case of essential thrombocytosis and was very difficult to manage. He described to the jury how factors other than blood test results affect a physician's decision whether to change doses of medication. In Dr. Abramson's opinion, Dr. Leary's treatment of Patty Wainwright was reasonable and within the scope of good medical judgment.
Dr. Allen B. Grosbach, a hematologist and oncologist who had formerly taught medicine at the Uniform Services University of Health Sciences in Bethesda and at Louisiana State Medical Center in Shreveport, and who had served on the medical review panel, testified as well. Dr. Grosbach reasoned that either Patty had received a clear cut overdose, which he said the literature does not support, or that she had the idiosyncratic irreversible aplasia reaction to Busulfan that sometimes happens. He indicated that these doses of Busulfan were no more than what most physicians would give for this type of illness and concluded that Patty had an idiosyncratic reaction to the Busulfan.
In addition to the above referenced expert testimony, Dr. Leary described at length his reasons for the method he used in the treatment of Patty Wainwright's disease. The evidence presented to the jury included conflicting opinions from expert witnesses regarding Dr. Leary's understanding of the drug Busulfan and the reasonableness of the manner in which he used it to treat Patty Wainwright.

Analysis
An unsuccessful course of treatment is not per se an indication of malpractice. The doctor's conduct is evaluated in terms of reasonableness under the circumstances existing when his professional judgment was exercised. The physician will not be held to a standard of perfection nor evaluated with benefit of hindsight. Opinions from medical professionals are necessary to the determination of the applicable standard of care and the breach thereof. The views and opinions of these expert witnesses, though not controlling, are persuasive. It is for the trier of fact to evaluate conflicting expert opinions in relation to all the circumstances of the case. Gibson and Roland both supra.
The jury heard evidence that the life-threatening disease suffered by Patty Wainwright called for controversial treatment. Almost every medical expert who testified acknowledged that the treatment was determined by the judgment of the physician and that there were no hard and fast rules about dosage amounts or frequency. Each physician who testified had a somewhat different opinion as to how Busulfan should be administered, although most agreed that the effects of a constant dosage was more easily monitored. Drs. Leary, Abramson and Grosbach stated that the treatment regimen which Dr. Leary used was within accepted practices and did not fall below the applicable standard of care.
After trial, each member of the 12-person jury answered the following question:
Do you find from a preponderance of the evidence that the treatment rendered Patty Wainwright by Dr. Marshall Leary fell below the standard of care ordinarily practiced by physicians within his medical specialty and that this breach in the standard of care was the sole proximate cause or a contributing cause of damages sustained by the plaintiff?
The jury returned a 9-3 verdict in favor of Dr. Leary (nine answered "no" and three answered "yes"). We find that the jury was faced with conflicting expert medical testimony in a case tried eight years after the death of Patty Wainwright. The jury selected one of two or more permissible views supported by the evidence at trial. For this reason, we find no error in the jury verdict and the resultant judgment.

*238 Exclusion of Expert Testimony

Wainwright complains that the trial court erred in denying his request to qualify Dr. William F. Anderson as an expert. After both parties had questioned Dr. Anderson about his education and other matters which bear on his expertise, both in general and for the instant case, the record reflects that the trial court stated the following:
By the Court: The ... I'm looking ... I'm reading from my order resetting the case for trial for ... to be ... that order was ... Well, I didn't put a date on it but it was filed January the 29th of 1992...
By Mr. Loomis: Yes, sir.
By the Court: And it says, "Further ordered that the court's oral deadline of January 15th, 1992 for the addition of expert witness be adhered to by the parties for this suit". For that reason, Dr.... this doctor may not testify as an expert witness.
Wainwright's counsel noted that Dr. Anderson's name was included in the answer to interrogatories and that the court had ordered him to supplement those answers. After some discussion, the trial court then stated the following:
By The Court: Gentlemen, thank you. I've heard enough. My ruling is this, the ... Mr. Loomis, it's true you added this doctor's name to the list, but he did not ... you did ... by your own admission you did not intend on using him as an expert until sometime yesterday.
Dr. Anderson then testified under direct and cross examination, that he filled in for Dr. Leary on alternating weekends and holidays. He had cared for Patty Wainwright during Dr. Leary's absence on several occasions, and was called when she died.
The jury heard testimony about Dr. Anderson's education and background as a physician. They heard that he is board certified in internal medicine, as well as the sub-specialties of hematology and oncology. There was no indication that Dr. Anderson would not meet the expert witness requirements of LCE Art. 703. The trial court's denial of Wainwright's request to qualify Dr. Anderson as an expert was predicated upon its pre-trial order. We note that Dr. Leary did not object to Wainwright's attempt to qualify Dr. Anderson as an expert. In essence, the trial court ruled that Wainwright's eleventh-hour decision to use Dr. Anderson as an expert did not comply with its pre-trial order and that, therefore, Dr. Anderson may not testify as an expert.
The record reflects that Dr. Anderson had been deposed in 1985. Dr. Anderson's name was included as one of plaintiff's witnesses in Wainwright's "Answers to Interrogatories", filed August 8, 1986 and in Pretrial Conference Statements, filed February 19, 1991 April 17, 1991, and April 18, 1991. We agree that this trial court ruling was error because this witness was listed in these statements. Under the unique circumstances of this case, where (1) the witness had been listed in the pre-trial statements and deposed, and (2) there was no objection made by opposing counsel, we have found and Dr. Leary has cited, no legal support for the trial court's ruling.
Wainwright further claims that he has been prejudiced by the arbitrary exclusion of Dr. Anderson's expert testimony. For the following reasons, we find harmless the trial court error in refusing to allow Dr. Anderson to testify as an expert.
Wainwright has not shown harm by the ruling because Dr. Anderson did testify in the trial. What the trial court disallowed was his testimony in the capacity of an expert witness. Specifically, the effect of the ruling was to deny Wainwright the opportunity to ask Dr. Anderson hypothetical questions in order to elicit opinions. However, Dr. Anderson did testify as a medical doctor. The jury was fully informed that Dr. Anderson was a hematologist who was familiar with Dr. Leary's treatment of Patty Wainwright. He periodically filled in for Dr. Leary, and he described to the jury the extent of his involvement in Patty's treatment process. Wainwright has not demonstrated how the denial of his request to qualify Dr. Anderson as an expert affected the jury verdict.
*239 Although the trial court's sua sponte denial of Dr. Anderson's right to testify as an expert is questionable, we cannot say that it affected the ultimate outcome of the case. Dr. Anderson testified extensively before the jury about his role in Patty's treatment regimen and gave his opinion in response to questions asked by each party. On this record, we conclude that this ruling is harmless error.
Wainwright also claims that the trial court used its contempt authority to prohibit his counsel from proffering the testimony of Dr. Anderson but the record reflects no such prohibition. The trial court's admonition to counsel was designed to cut off discussion of the issue after the court's ruling had been announced. Given the extensive testimony of Dr. Anderson already discussed, we find no merit to this contention.

CONCLUSION
For the reasons stated above, we find no merit to Wainwright's assignments of error and the jury verdict in favor of defendants is affirmed at plaintiff's costs.
Because of our disposition of the issues discussed above, we do not address Wainwright's contention that the trial court should have awarded damages.
AFFIRMED.