657 So.2d 741 (1995)
Theresa CLARK, et al.
v.
BATON ROUGE GENERAL MEDICAL CENTER, et al.
No. 94 CA 2239.
Court of Appeal of Louisiana, First Circuit.
June 23, 1995.
*743 Phil Breaux, St. Gabriel, for plaintiffs Theresa Clark, Darlene Knight, Virginia Reed, June Barker and B.F. Roubique.
Michael M. Remson, Baton Rouge, for defendant Baton Rouge Gen. Medical Center.
Before FOIL, WHIPPLE and KUHN, JJ.
KUHN, Judge.
After the death of a stroke victim, her children and surviving spouse sued defendant-hospital, Baton Rouge General ("BRG"). A jury found the hospital liable under 42 U.S.C.A. § 1395dd, the Emergency Medical Treatment and Active Labor Act ("EMTALA") and awarded damages. Additionally, the jury assessed 75% comparative fault to non-party doctors.

I. FACTS
On May 13, 1989, Mrs. Rosemary Roubique suffered a massive stroke while visiting in St. Landry Parish. She was rushed by ambulance to the emergency room ("ER") at Opelousas General Hospital ("OGH"). Mrs. Roubique was examined by an ER physician who stabilized her condition. She was unable to communicate verbally and was responsive only to painful stimulation. Because Mrs. Roubique had a history of heart complications and an artificial heart valve had been in place for the seventeen years preceding the stroke, the family (plaintiffs) *744 requested her treating cardiologist, Dr. James Calvin, be contacted by the OGH ER physician. Dr. Calvin instructed that Mrs. Roubique be transferred by ambulance to BRG where he, along with a neurologist and an internist, would meet the patient.
Mrs. Roubique arrived at BRG at approximately 2:00 p.m. and was removed from the ambulance to the ER by stretcher. Neither Dr. Calvin, the neurologist, nor the internist were present at the hospital upon Mrs. Roubique's arrival. The nursing staff assessed Mrs. Roubique's condition and portions of a triage were performed. A recordation of all her vital signs was made.
Soon after Mrs. Roubique's arrival at BRG, plaintiffs, B.F. Roubique, Darlene Knight, June Barker, and Virginia Sue Clark Reed, met Mrs. Roubique and plaintiff Theresa Clark Boyd, who had accompanied her mother by ambulance, in the emergency department at BRG. June Barker was advised by an ER receptionist that because the patient's insurance carrier was Community Health, BRG could not treat Mrs. Roubique. The receptionist explained to the family that BRG had formerly been classified as a primary care provider under Community Health's policy but due to a recent change, Our Lady of the Lake Hospital ("OLOL") was now the primary care provider. The family advised medical personnel in the ER they would assume responsibility for the expenses incurred at BRG if Community Health would not pay but they did not want Mrs. Roubique transferred.
Mrs. Roubique was put on a cardiac monitor and was placed in a bed in a room directly across from the nurses station in the Emergency Department. A nurse telephoned Dr. Calvin and was advised by him that he was no longer "on call" and that Dr. Kilpatrick would have to be contacted to attend to Mrs. Roubique's treatment. Dr. Kilpatrick was notified and a report on Mrs. Roubique's condition was given to him by a nurse over the telephone. Dr. Kilpatrick ordered a Community Health neurologist and a heart specialist be consulted to examine the patient and an EKG, a chest x-ray, blood and lab work be performed, but he did not go to the hospital or physically examine Mrs. Roubique during her stay at BRG.
While Mrs. Roubique waited to be treated by her private physician, she began to vomit. Because Mrs. Roubique was on oxygen, her attempts to remove the oxygen mask to permit unobstructed vomiting were thwarted by her daughters who did not understand their mother's conduct. Mrs. Roubique's daughters became concerned, pushed the nurses call button and, after no response, went out into the hall to plead for assistance. The ER medical personnel refused to touch Mrs. Roubique stating that she could not be treated because she was a Community Health patient.
At approximately 4:30 p.m., a neurologist, Dr. Steven Cavalier, examined Mrs. Roubique in the ER at BRG. After eliciting a very abbreviated medical history from the plaintiffs, Dr. Cavalier conducted a neurological examination on Mrs. Roubique and determined she was stable enough to be transferred to OLOL.
Mrs. Roubique was transported to OLOL by ambulance. After an initial period of improvement, Mrs. Roubique developed additional heart complications, an irregular heart beat, and progressive respiratory problems. On May 15, 1989, at OLOL Mrs. Roubique suffered a second stroke which resulted in her death.
A trial on the merits commenced on January 18, 1994, and a jury found BRG had violated the EMTALA by failing to provide an appropriate medical screening. The jury also determined that while BRG breached the standard of care it owed to Mrs. Roubique, the breach was not a cause of injury or death. Additionally, the jury concluded Dr. Calvin and/or Dr. Kilpatrick, who were not parties to the lawsuit,[1] breached the standard of care required of physicians and that the breach was a cause of injury or death to Mrs. Roubique. In its assessment of fault, the jury assigned 25% liability to BRG and 75% liability to Dr. Calvin/Dr. Kilpatrick. The jury awarded damages for Mrs. Roubique's *745 physical pain, suffering, and mental anguish in the amount of $10,000 and awarded damages for loss and deprivation of companionship, love, affection and mental anguish as a result of the death of Mrs. Roubique to Darlene Knight, Theresa Clark Boyd, June Barker, Virginia Reed, and B.F. Roubique in the amount of $20,000 each. Medical expenses in the amount of $364 were also awarded to the plaintiffs.
Plaintiffs and BRG have filed separate appeals, raising the following issues:
(1) Whether the EMTALA was properly applied and whether the evidence supports the jury's determination;
(2) Whether the evidence supports a finding that BRG's breach of the standard of care was not the cause of her injury or death.
(3) Whether the evidence supports a finding of comparative fault on the part of Dr. Calvin and/or Dr. Kilpatrick;
(4) Whether the evidence supports the jury's assessment of damages;
(5) Whether the judgment properly awards legal interest.

II. ANALYSIS

A. EMTALA
In 1986, the U.S. Congress enacted 42 U.S.C.A. § 1395dd, the EMTALA[2], in response to a growing concern that hospitals were "dumping" patients who were unable to pay, by either refusing to provide emergency medical treatment or by transferring patients before emergency conditions were stabilized. Brooks v. Maryland General Hospital, Inc., 996 F.2d 708, 710 (4th Cir.1993). The EMTALA imposes a duty to provide a medical screening examination and stabilizing treatment to any patient who seeks medical care in hospitals which receive Medicare funds and which have an emergency department.
42 U.S.C.A. § 1395dd provides in relevant part:
(a) Medical screening requirement
In the case of a hospital that has a hospital emergency department, if any individual... comes to the emergency department, and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition ... exists.
(b) Necessary stabilizing treatment for emergency medical conditions and labor
(1) In general
If any individual ... comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either
(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
(B) for transfer of the individual to another medical facility....
In order to prevail on a complaint under the EMTALA, plaintiff must establish that the hospital departed from its standard screening procedures in its treatment of a patient. Failure to comply with the EMTALA results in strict liability on the part of the hospital. Stevison v. Enid Health Systems, Inc., 920 F.2d 710, 713 (10th Cir.1990). Hutchinson v. Greater Southeast Community Hospital, 793 F.Supp. 6, 8 (D.D.C.1992).
Additionally, we note under Louisiana jurisprudence, a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to *746 the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where a factfinder's finding is based on its decision to credit the testimony of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Ferrell v. Fireman's Fund Ins. Co., 94-1252, pp. 4-5; (La. 2/20/95) 650 So.2d 742, 745-746.

1. An Appropriate Medical Screening
BRG maintains the jury erred in finding that a request for an examination or treatment was made on Mrs. Robique's behalf when she went to the emergency room at BRG. BRG asserts the EMTALA was not designed to apply in non-emergency care situations. They likewise claim this law is not applicable because Mrs. Roubique was transferred at the request of her treating physician and she did not present herself for emergency medical treatment so as to trigger the duty to provide an appropriate medical screening created by the statute. In addition, BRG challenges the jury's finding of fact that an appropriate medical screening was not performed on Mrs. Roubique.
BRG's ER Policy/Procedure Manual was admitted into evidence and establishes the standard operational procedure in this instance. Chapter II, entitled Emergency Department Organization, Direction & Staffing, on p. 0057 states "Subject: Triage," providing in pertinent part:

I. POLICY
Any individual who requests a medical evaluation (or on whose behalf such an evaluation is requested) in the hospital's Emergency Department shall be evaluated by authorized personnel.
It is not necessary for this court to address whether a hospital has a duty to provide an appropriate medical screening to an individual who is transferred to a hospital by a private physician for non-emergency treatment. The record is replete with evidence indicating Mrs. Roubique was physically present in the ER at BRG, she began to experience episodes of vomiting. Members of her family perceived her condition had changed into an emergency situation. Mrs. Roubique was in critical condition at the time of her arrival from OGH. She had yet to be examined by her treating physician. Regardless of whether BRG initially had a duty to provide an appropriate medical screening, when members of her family sought assistance from ER medical personnel, BRG violated its own emergency department policy by failing to examine her. Because BRG failed to perform any medical screening when members of the patient's family requested assistance, the jury's finding is sufficiently supported by the evidence. Ferrell v. Fireman's Fund Ins. Co., 650 So.2d at 746.
There is ample evidence in the record to support the jury's determination that a request for examination or treatment was made on Mrs. Roubique's behalf. Plaintiff Darleen Knight testified that while she and her sisters were with their mother in a room in the emergency department of BRG, Mrs. Roubique started to pull off her oxygen mask. Mrs. Knight described how she became concerned about her mother's condition. She paged a nurse on a call button but received no response. Subsequently, according to Mrs. Knight's testimony, she went into the hall and pleaded with medical personnel to have a doctor examine her mother. Despite pleading for assistance, Mrs. Knight testified medical personnel refused to help Mrs. Roubique stating she could not be treated because of her insurance coverage. Instead, bed linen was deposited at the foot of the bed while the patient laid in her vomit. Mrs. Knight explained how she and her sister, Theresa Clark Boyd, were cleaning their mother without assistance from any one at BRG. Plaintiffs, Mrs. Boyd and Virginia Sue Clark Reed corroborated Mrs. Knight's testimony.
Based on the above evidence, the jury obviously found Mrs. Roubique came to the emergency department at BRG and a request was made on her behalf for examination or treatment for a medical condition. The jury concluded BRG did not provide an appropriate medical screening. In light of the evidence presented to the jury, we cannot conclude that these findings are clearly wrong or manifestly erroneous.

*747 2. Stabilization
The EMTALA requires only that a hospital stabilize an individual's medical condition and not that it cure the patient. The hospital's responsibility under the EMTALA ends when it has stabilized the individual's medical condition. Green v. Touro Infirmary, 992 F.2d 537, 539 (5th Cir.1993).
Plaintiffs assert the jury erred in finding Mrs. Roubique's condition had been stabilized prior to her transfer from BRG to OLOL as mandated by the EMTALA.
At trial, several physicians testified Mrs. Roubique was in stable condition at the time of transfer from BRG to OLOL. Neurologist, Dr. Steven Cavalier, was the first physician to examine Mrs. Roubique. After conducting a neurological examination, Dr. Cavalier determined Mrs. Roubique was in stable enough condition to be transferred safely. He noted that, while the patient was in essentially the same condition as she was when she left OGH, there was nothing significant an ER physician could have done to improve her situation prior to transfer.
Dr. Henry Harvey also examined Mrs. Roubique while she was at BRG. Dr. Harvey, who practices internal medicine, testified that his partner was Mrs. Roubique's primary physician under her Community Health insurance plan. Because of the regulations of Community Health, a primary physician had to sign the transfer slip in order to relocate the patient. Dr. Harvey testified he examined Mrs. Roubique after Dr. Cavalier. He too felt it was not harmful to move Mrs. Roubique. He also stated had he seen anything to indicate the patient's well-being would be jeopardized, he would have stopped the transfer.
In addition to the testimony of the two physicians who examined Mrs. Roubique during her stay at BRG, two other physicians testified based on their reviews of the patient's medical records. Dr. Sara D'Autremont, Director of the Emergency Department at BRG, was accepted as an expert in the field of Emergency Medicine. Dr. D'Autremont opined in consideration of the patient's devastating problem, Mrs. Roubique was in stable condition at the time of her transfer. Dr. D'Autremont felt while Mrs. Roubique was not in her normal state of health, she was as stable as she could be. Dr. Ralph D'Armore's testimony was also based on a review of Mrs. Roubique's medical records. In his opinion, there was no deterioration of Mrs. Roubique's condition during her stay at BRG and she was stable at the time of transfer.
Considering the overwhelming medical testimony, we determine the jury was not clearly wrong to find Mrs. Roubique was in stable condition at the time of transfer from BRG to OLOL.

B. CAUSATION
Plaintiffs contend the jury erred in its determination that the breach of the standard of care by BRG was not a cause of injury or death to Mrs. Roubique.[3]
Dr. Steven Cavalier explained in detail his theory on the cause of Mrs. Roubique's second stroke which resulted in her death. Stating after her first stroke, Mrs. Roubique had suffered permanent impairment, Dr. Cavalier explained the patient developed some heart problems. Noting the development of atrial fibrillation, Dr. Cavalier felt Mrs. Roubique's heart problems became progressive and she developed progressive respiratory problems. It was this doctor's opinion when her heart went into atrial fibrillation and did not beat well, it caused a piece of a blood clot in the heart near the artificial valve to break off and travel to the brain stem at the back part of the brain, in the control center. Dr. Cavalier opined Mrs. Roubique was brain dead after the second stroke. He stated specifically nothing that was or was not done at BRG caused or in any way contributed to Mrs. Roubique's death.
If this court were reviewing this factual issue on a de novo basis, a different determination regarding the breach in the standard of care by BRG and the cause of injury or *748 death to Mrs. Roubique might be reached. However, our review is not de novo and this court cannot set aside the jury's determination in the absence of factual findings which are manifestly erroneous or clearly wrong. Ferrell v. Fireman's Fund Ins. Co., 650 So.2d at 746. Since the jury's finding is supported by expert testimony, it cannot be said this finding is manifestly erroneous or clearly wrong.

C. COMPARATIVE FAULT
Plaintiffs next urge the jury erred in finding and in assessing Dr. Calvin and/or Dr. Kilpatrick with 75% negligence.
La.R.S. 9:2794 sets forth the requirements necessary in a medical malpractice action and provides in relevant part:
A. In a malpractice action based on the negligence of a physician ... the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... actively practicing in a similar community or locale and under similar circumstances; and where the [physician] practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.
(2) That the [physician] either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
Dr. Calvin and Dr. Kilpatrick were cardiologists in practice together. Dr. Calvin was Mrs. Roubique's treating cardiologist and the physician the family advised be contacted when the patient arrived at the ER at OGH. Although the record is devoid of any expert testimony establishing the standard of care for cardiologists, we find the alleged acts of negligence did not raise issues peculiar to the medical specialty of cardiology. Is there sufficient evidence to support the jury's finding of comparative fault on the part of Drs. Calvin and Kilpatrick?
Plaintiffs Darlene Knight, June Barker, Theresa Clark Boyd and Virginia Sue Clark Reed each testified that while they were present the ER physician at OGH spoke to Dr. Calvin. Based on that telephone conversation between these two physicians, these witnesses understood that Dr. Calvin was going to pre-admit Mrs. Roubique to BRG and he would be waiting at the hospital for her along with a neurologist and an internist. After assuming responsibility for Mrs. Roubique, Dr. Calvin contacted a nurse at the ER at BRG and directed he be notified upon the patient's arrival. Despite efforts to follow Dr. Calvin's instructions, Nurse Dugas testified Dr. Calvin became upset when contacted by telephone, advising he was no longer "on call" and his partner, Dr. Kilpatrick, would be attending to Mrs. Roubique. According to the testimony of several members of the BRG medical personnel and Mrs. Roubique's medical records, Dr. Kilpatrick ordered a specific treatment plan for Mrs. Roubique which included a neurological consultation. He did not, however, go out to the hospital to physically attend to her care. Additionally, all the medical personnel who testified on BRG's behalf stated, in accordance with BRG's operational policy, an examination of Mrs. Roubique was deferred to her private physician.
We find the failure of Dr. Calvin and/or Dr. Kilpatrick to respond to Mrs. Roubique's medical condition as promised when each physician knew or should have known their presence was necessary was sufficient for a jury to infer negligence. See Hastings v. Baton Rouge General Hospital, 498 So.2d 713, 719-720 (La.1986).
In a medical malpractice action, claimant need not show the doctor's conduct was the only cause of harm nor must all other possibilities be negated, but rather, claimant must show by a preponderance of the evidence they suffered injury because of the doctor's conduct. Wainwright v. Leary, *749 623 So.2d 233, 236 (La.App. 2nd Cir.), writ denied, 629 So.2d 1127 (La.1993). Additionally, in order to prove a causal relationship existed between the alleged negligent treatment and the injury sustained in circumstances where the patient dies, a claimant need only prove the physician's malpractice resulted in loss of a chance for survival, and is not faced with the unreasonable burden of demonstrating the patient would have survived if properly treated. Ware v. Medical Protective Ins. Co., 621 So.2d 54, 58 (La.App. 2nd Cir.), writ denied, 629 So.2d 354 (La. 1993).
Dr. Tom Douglas testified as an expert in emergency medicine. Dr. Douglas explained it is common knowledge among physicians, especially in situations where the patient is suffering from anything serious, the sooner treatment is instituted, the better the result. He felt earlier administration of several specific treatments could have increased Mrs. Roubique's chances for survival. Given this expert testimony, no manifest error can be found in the jury's conclusions (1) there was a breach in the standard of care by Dr. Calvin and/or Dr. Kilpatrick which was a cause of injury or death to Mrs. Roubique and (2) in its assessment of 75% fault to Drs. Calvin and Kilpatrick.

D. DAMAGES
BRG has assigned error to the jury's assessment of damages asserting the award to plaintiff Mr. B.F. Roubique, the decedent's husband, is not supported by the evidence. Plaintiffs contend the jury's award of damages is abusively low and the jury erred in failing to award funeral expenses.
We are not persuaded the jury's award of general damages in the amount of $20,000 to Mr. B.F. Roubique was improper. Virginia Sue Clark Reed testified Mr. and Mrs. Roubique were married for eighteen years and had a good marriage. Mrs. Reed described her regular visits with her step-father and his health problems which prevented him from appearing a trial. She explained Mr. Roubique was 72 years old and his grief for the loss of his wife coupled with his medical problems prevented him from appearing on his own behalf. We cannot conclude the jury's reliance on the testimony of Mrs. Roubique's daughter was manifestly erroneous or inappropriate.
In reviewing general damages the role of an appellate court is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact, and the adequacy of an award should be determined by the facts or circumstances particular to the case under consideration. An appellate court should rarely disturb an award of general damages since the discretion vested in the trier of fact is "great;" the standard for review is nonspecific, and only when an award is, in either direction, beyond that which a reasonable trier of fact could assess for effects of a particular injury to a particular plaintiff under particular circumstances should an appellate court increase or reduce an award. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260-1261 (La.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
The evidence at trial established the plaintiffs, daughters of Mrs. Roubique, were major children that neither lived with nor were supported by Mrs. Roubique. The testimony of Mrs. Roubique's neurologist established nothing done at BRG caused or contributed to the second stroke which resulted in Mrs. Roubique's death. It is undisputed that Mrs. Roubique was in poor health. Plaintiff daughters testified Mrs. Roubique had serious heart disease, the life expectancy of the artificial heart valve was at its end, and prior to her arrival at OGH, Mrs. Roubique had several minor strokes. Additionally, Dr. Cavalier felt as a result of her massive stroke which had occurred before her arrival to BRG, Mrs. Roubique had suffered permanent impairment in her speech and in her ability to communicate. Dr. Cavalier testified Mrs. Roubique was not likely to work again after the first stroke and she would have required prolonged and extensive medical treatment. Accordingly, we do not find the jury's award of general damages in the amount of $10,000 to Mrs. Roubique and $20,000 each to Darleen Knight, June Barber, Theresa Clark Boyd, Virginia Sue Clark *750 Reed and B.F. Roubique to be an abuse of the great discretion afforded to the trier of fact.
Because the jury determined BRG's breach in the standard of care was not the cause of the death of Mrs. Roubique, we find no error in the jury's decision to decline to award funeral expenses to plaintiffs. Epps v. City of Baton Rouge, 604 So.2d 1336, 1347 (La.App. 1st Cir.1992).

E. LEGAL INTEREST
Finally, plaintiffs assert the judgment is erroneous with respect to date and method of applying legal interest. Plaintiffs contend because their lawsuit alleging violations by BRG under the EMTALA was originally filed on May 1, 1990, legal interest should commence from that date. In support of their contention, plaintiffs rely on La.R.S. 13:4203 which provides, "[l]egal interest shall attach from date of judicial demand, on all judgments, sounding in damages, `ex delicto', which may be rendered by any of the courts."
BRG urges the judgment is correct as the allegations of medical malpractice against the hospital had to first proceed to a medical review panel. BRG's assertion is a reliance on La.R.S. 40:1299.47(M) which provides in pertinent part, "[l]egal interest shall accrue from the date of filing of the complaint with the board on a judgment rendered by a court in a suit for medical malpractice...."
Because BRG's liability was found by the jury to be based on a violation of the EMTALA and not on the breach of the standard of care which would trigger the application of La.R.S. 40:1299.47(M), we find that La.R.S. 13:4203 is applicable. Accordingly, we amend the judgment to provide for legal interest commencing on May 1, 1990, the date plaintiffs originally filed their petition alleging violations under the EMTALA.
In challenging the method of calculation, plaintiffs suggest legal interest should be applied to the entire judgment and then reduced by the percentage of comparative fault assessed against the non-party physicians. The judgment reduces each plaintiff's award by the 75% fault assessment and then applies legal interest. Regardless of whether legal interest is calculated as plaintiffs suggest or as specified in the judgment, the amount is the same. Accordingly, we find no merit in plaintiffs' argument.

III. CONCLUSION
For the reasons expressed above, the March 7, 1994 judgment is amended to award legal interest from May 1, 1990, the date plaintiffs originally filed their petition for damages alleging violation of the EMTALA. As amended, it is affirmed. All costs of this appeal are assessed against defendants.
AMENDED IN PART AND, AS AMENDED, AFFIRMED.
NOTES
[1] Plaintiffs originally named Drs. Calvin and Kilpatrick as defendants in this lawsuit. On January 13, 1994, a judgment voluntarily dismissing Drs. Calvin and Kilpatrick was signed.
[2] The EMTALA is also referred to as the Patient Anti-Dumping Act.
[3] The parties did not assign error to the jury's determination that BRG breached the standard of care.