692 So.2d 1365 (1997)
Brian SMITH
v.
Mark JUNEAU, Jr., M.D., et al.
No. 95-CA-0724.
Court of Appeal of Louisiana, Fourth Circuit.
April 9, 1997.
*1366 Lloyd W. Hayes, Thomas, Hayes And Buckley, L.L.P., New Orleans, for Defendant-Appellant Mark Juneau.
Daryl A. Higgins, Thomas W. Darling, Windhorst, Gaudry, Ranson, Higgins & Gremillion, L.L.P., Gretna, for Defendant-Appellant NME Hospitals, Inc. d/b/a Meadowcrest Hospital.
C.T. Williams, Jr., J. Elliott Baker, Blue Williams, L.L.P., Metairie, for Intervenor-Appellant Louisiana Patient's Compensation Fund Oversight Board.
Paul M. Sterbcow, Lewis & Kullman, New Orleans, and Fredericka H. Wicker, Metairie, for Plaintiff-Appellee Brian Smith.
Richard P. Ieyoub, Attorney General, Jay C. Zainey, Glenda M. Barkate, Special Assistant Attorney General, Ashley L. Belleau, Metairie, for Intervenor-Appellee Charity Hospital and Medical Center of Louisiana at New Orleans.
*1367 Before CIACCIO, LOBRANO and JONES, JJ.
JONES, Judge.
This is a medical malpractice action brought by Brian Smith against defendants, Dr. Mark Juneau, Jr. and NME Hospitals, Inc. d/b/a/ Meadowcrest Hospital.[1] Following a trial on the merits, plaintiff was awarded damages totalling Five Hundred Thousand Dollars ($500,000). Defendants, Dr. Mark Juneau, Jr., NME Hospitals, Inc. d/b/a/ Meadowcrest Hospital, and intervenor, the Louisiana Patient's Compensation Fund Oversight Board (LPCF) appeal the judgment. We affirm.

FACTS
Plaintiff was injured in a motor vehicle accident and was taken to Meadowcrest Hospital for treatment. At the trial of the case, plaintiff testified he had no memory of what happened. All he remembered was waking up on the side of the road and being in pain. He was found by a policeman and was brought to the emergency room of Meadowcrest Hospital at approximately 8:30 a.m. on October 16, 1988. According to medical records of Meadowcrest Hospital, plaintiff was driving a small pickup when he lost control of his vehicle and ran head-on into a telephone pole striking at approximately 55 to 60 miles per hour. At the time of the accident, plaintiff was not wearing a seat belt and was thrown from the vehicle. According to medical records, upon arrival EMS found plaintiff lying prone on the ground. He was awake and alert, but he did not remember anything about the accident, except he remembered being sleepy. At the time of his admittance, he was suffering from numerous severe injuries including abdominal trauma, a fractured left humerus, a fractured right ankle, an unstable fractured pelvis and a ruptured bladder. He was taken from the emergency room in shock to the operating room where he underwent a surgical abdominal exploration and repair of his ruptured bladder. It is undisputed the injury to plaintiff's pelvis was extensive, and plaintiff suffered from massive internal bleeding. During his hospitalization at Meadowcrest, he was given 14 units of blood. Plaintiff conceded in closing argument the treatment he received from the physicians and nurses at Meadowcrest during the first 24 hours after the accident saved his life.
Following abdominal surgery by Dr. Friley, the general surgeon, defendant, Dr. Juneau, an orthopedic surgeon, in an effort to compress the pelvis, control the bleeding, and stabilize the pelvic fracture, placed plaintiff on a double egg crate mattress and in a pelvic sling. Because plaintiff weighed approximately 300 pounds, Dr. Juneau made a specially fitted sling to fit plaintiff. Plaintiff remained in intensive care for ten days. On October 26, 1988, he was transferred from the intensive care unit to a regular room. On October 27, 1988, Nurse Catalina Co was giving plaintiff a bed bath when she noticed a foul odor underneath the right side of his pelvic sling. The existence of the foul odor was noted in the medical records, but this fact was not brought to the attention of Dr. Juneau. An order was written to administer an enema just prior to plaintiff's transfer to Charity Hospital on October 28, 1988. During the attempted administering of the enema no evidence of skin breakdown was noted by the nurse.
On October 28, 1988, plaintiff was transferred to Charity Hospital so that specialized treatment for the pelvic fracture could be performed. Shortly after admission, he was examined by Nurse Kerry Allain who noticed an odor coming from some part of his body. Upon examining plaintiff's backside, Nurse Allain determined he had a large, terrible smelling decubitus (bedsore) on his buttocks. The alleged decubitus was subsequently debrided by Dr. Moore. Because the wound was extensive, the planned procedure could not be completed on the first attempt. The wound on his buttock was later dissected and debrided. Over the next ten months, plaintiff underwent a total of thirteen operative procedures relating to the alleged decubitus and its complications, which left him permanently disfigured and significantly disabled.
*1368 Following his discharge, plaintiff filed a complaint with a Medical Review Panel alleging Dr. Juneau, Dr. Schiro, Dr. Friley, and Meadowcrest Hospital had breached the applicable standard of care in failing to provide the care needed to prevent the decubitus. The medical review panel found the evidence did not support a conclusion defendants failed to meet the applicable standard of care. In its Reasons for Opinion, the medical panel found plaintiff did not have a decubitus ulcer problem, rather the panel determined tissue necrosis developed from the direct trauma to the right gluteal area and worked from the inside out, with hematoma formation and tissue necrosis. Panel members further found the course of plaintiff's problem was predetermined from the instant of the injury. Panel members specifically found "The gluteal problem of the right buttock was not a result of the pelvic sling or failure to move the patient to relieve the pressure in this area."
Plaintiff then initiated the instant court proceedings against Dr. Schiro, Dr. Friley, Dr. Juneau and Meadowcrest Hospital seeking damages for injuries allegedly resulting from the treatment he received at Meadowcrest Hospital from October 16 through October 28 of 1988.
Prior to voir dire, plaintiff dismissed Dr. Friley from the litigation. Following selection of the jury but prior to opening instructions, plaintiff dismissed Dr. Schiro from the litigation. The matter was then tried before a jury. The jury ruled in favor of plaintiff and against both defendants, finding Dr. Juneau was 30 percent at fault and Meadowcrest Hospital was 70 percent at fault, and awarded plaintiff a total of $1,194,000. Alleging the statutory cap was unconstitutional, plaintiff moved the court to enter judgment on the verdict. The Louisiana Patient's Compensation Fund Oversight Board filed a petition of intervention for the purpose of presenting argument on the issues of the constitutionality and meaning of La. R.S. 40:1299.42(B). The trial court denied plaintiff's motion to enter judgment based on the verdict and entered judgment in favor of plaintiff in the amount of $500,000, the statutory limit of liability. The judgment provided defendant, Dr. Juneau was to pay $100,000, defendant, NME Hospital, Inc. d/b/a/ Meadowcrest Hospital was to pay $100,000, and defendant, the Louisiana Patient's Compensation Fund was to pay $300,000, plus legal interest and all taxable costs. Later, the trial court signed an amended judgment further providing there be judgment in favor of intervenor, Charity Hospital of New Orleans in the amount of $94,000 for medical expenses payable by the Louisiana Patient's Compensation Fund, along with judicial interest as provided by law. Defendants, Dr. Juneau and NME Hospitals, Inc. d/b/a/ Meadowcrest Hospital and intervenor, the Louisiana Patient's Compensation Fund Oversight Board appeal the original and amended judgments of the trial court.

DISCUSSION AND LAW

Dr. Juneau's Assignment of Error 1
In the first assignment of error, defendant-appellant, Dr. Mark Juneau argues the jury was clearly wrong or manifestly erroneous when it found he deviated from the standard of care applicable to orthopedic surgeons. Dr. Juneau argues the evidence clearly supports a finding he did not deviate from the standard of care applicable to orthopedic surgeons. According to Dr. Juneau, the evidence presented at trial overwhelmingly supports a finding that plaintiff's injury was not a decubitus ulcer caused by the pressure from the pelvic sling; rather the injury occurred at the time of the accident when plaintiff suffered a violent trauma to his buttocks. In support of this argument, Dr. Juneau maintains that plaintiff's only properly qualified expert witness was Dr. Marvin Tile, an orthopedic surgeon practicing in Toronto, Canada. According to Dr. Juneau, Dr. Tile's testimony supports a finding that Dr. Juneau met the applicable standard of care in his treatment of plaintiff.

Applicable Standard of Care for Dr. Juneau
At the time this case was tried in 1994, La. R.S. 9: 2794 provided in relevant part:
A. In a malpractice action based on the negligence of a physician licensed under *1369 R.S. 37:1261 et seq., ... the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred. (emphasis added)
Pursuant to this statutory provision, this Court, in Coleman v. Touro Infirmary of New Orleans, 506 So.2d 571 (La.App. 4th Cir.), writ denied 507 So.2d 1247 and 507 So.2d 1248 (La.1987) stated:
A plaintiff in a malpractice action has the burden of proving the degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians within the involved medical specialty. The plaintiff must further prove that defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence along with his best judgment in applying it, and that this lack of knowledge or skill or the failure to exercise this degree of care caused plaintiff injuries that would not have otherwise been incurred. LSA-R.S. 9:2794(A); Gurdin v. Dongieux, 468 So.2d 1241 (La.App. 4th Cir.1985), writ denied, 474 So.2d 946 (La.1985); Matranga v. Sara Mayo Hosp., 463 So.2d 632 (La.App. 4th Cir.1984), writ denied, 467 So.2d 540 (La.1985); Wiley v. Karam, 421 So.2d 294 (La.App. 1st Cir.1982).
In determining whether the defendant possessed the requisite degree of knowledge or skill or whether he exercised reasonable care and diligence, the court is guided by expert witnesses who are members of the defendant's profession and who are qualified to testify. Gurdin v. Dongieux, supra; Guillory v. Buller, 398 So.2d 43 (La.App. 3rd Cir.1981). The views and opinions of the expert witnesses, though not controlling, are very persuasive in this regard. Wiley v. Karam, supra; Guillory v. Buller, supra.

Id. at 575.
The evidence concerning whether Dr. Juneau deviated from the standard of care in treating plaintiff was clearly contradictory. After hearing all the evidence, the jury, in response to jury interrogatories, specifically found 1) plaintiff proved the degree of care ordinarily exercised by physicians practicing in the same field as Dr. Juneau, 2) Dr. Juneau deviated from the standard of care in the medical care and treatment rendered to plaintiff, and 3) Dr. Juneau's deviation from the standard of care was a legal cause of damages suffered by plaintiff. It is for the trier of fact to evaluate conflicting expert opinions in relation to all the circumstances of the case. This Court must now determine whether these findings of the jury were manifestly wrong.
In support of the argument that the jury committed manifest error, Dr. Juneau argues the evidence overwhelmingly supported his theory that plaintiff's massive loss of tissue on his buttocks was an inevitable, unpreventable result of the tearing away of muscle tissue from the pelvis at the time of his initial injury, and plaintiff's injury was not a decubitus, but rather a "Morelle-Lavalee lesion" that did not manifest itself until plaintiff was transferred to Charity Hospital.
Dr. Robert E. Ruel, an orthopedic surgeon who became board certified in orthopedics in 1971 was recognized as an expert in the field of orthopedic surgery. Dr. Ruel testified he was on the medical review panel which considered plaintiff's claim. He, Dr Jefferson Kaye (an orthopedic surgeon at Ochsner), and Dr. Steven Jones (a general surgeon who *1370 practices in New Orleans East) were the three physicians on the medical review panel. They found no medical evidence of any wrongdoing in the treatment of this patient. They reviewed the records from Meadowcrest Hospital and concluded plaintiff did not have a decubitus ulcer. Rather, injury to his buttocks was caused by trauma from the accident. They concluded plaintiff failed to prove any deviation from the standard of care by Dr. Schiro, Dr Friley, Dr. Juneau, or Meadowcrest Hospital. They further concluded all defendants acted according to the standard of the community and the care of medicine as well as a hospital and there was no medical fault in this particular case.
Dr. Ruel further testified he had treated fracture cases like this and he never had a problem with a decubitus forming because of the use of a pelvic sling. In his opinion there was nothing Dr. Juneau could have done to prevent the skin breakdown and problems plaintiff suffered with his skin.
Dr. Charles Dupin, a plastic surgeon who is board certified in ear, nose and throat, head and neck surgery, as well as plastic surgery was recognized by the court as an expert in the field of plastic surgery. Dr. Dupin testified he has treated hundreds of bedsores. He reviewed the medical records of Meadowcrest Hospital and Charity Hospital concerning the treatment of plaintiff. He also reviewed photographs counsel showed him of plaintiff during the course of that treatment. His opinion was the injury was not a decubitus ulcer. According to Dr. Dupin, decubitus ulcers usually occur when there exists a bony prominence, i.e. an area where the bone is simply covered by skin and so there is not much padding. He was of the opinion plaintiff's injury was related to massive injury to the pelvis. He testified he did not believe leaving the sling on for 12 days caused the decubitus ulcer. He conceded it could cause a decubitus ulcer, but not this decubitus ulcer. The main reason is that pressure injuries like plaintiff's appear where there is a sudden injury to the muscle. The muscle dies very early on and placing the person in pelvic traction for 1 to 12 days would not make one bit of difference as to the outcome.
In his opinion placing a patient in a sling would not cause muscle necrosis. He believed plaintiff had a degloving type injury, and there was nothing Dr. Juneau or anybody could have done to have prevented this skin breakdown. He stated other names for this type injury are atypical avulsion injury or MorelleLavalee syndrome.
Dr. Kenneth Farris was recognized as an expert in the field of pathology. Dr. Farris testified he had reviewed the same slides that had been reviewed by Dr. Liuzza,[2] Dr. Liuzza's report, and some of the medical records from Meadowcrest Hospital. In his opinion, this was not a decubitus ulcer. Rather, plaintiff's injury was a result of trauma from the accident. He had never seen a decubitus that involved death of muscle, and testimony that plaintiff had lost his entire right gluteus maximus muscle was not consistent with a decubitus injury.
Dr. Dabezies, a board certified orthopedic surgeon, was recognized as an expert in the field of orthopedic surgery. Dr. Dabezies was the physician who performed the surgery to close up the front of Brian Smith's pelvis with two bone plates, while Brian Smith was at Charity Hospital. Dr. Juneau had contacted Dr. Dabezies about performing the surgery. To his knowledge no one else in the City was performing this kind of surgery in 1988. Dr. Dabezies testified he did not think Brian Smith had a decubitus. Rather, he believed Brian Smith had a degloving injury or a Morelle-Lavalee lesion that ultimately sloughed. According to Dr. Dabezies, there was nothing Dr. Juneau could have done to prevent this skin lesion from occurring. The injury occurred at the time of the trauma when the plaintiff hit the pole.
Dr. Dabezies testified that as a physician, he does not specifically write orders in the record to the nurse to inspect the skin and it does not surprise him Dr. Juneau did not write "inspect the skin". He assumes when the nurses bathe a patient, change linens, etc. they check the areas of the skin. If *1371 there is no notation of any lesion in the medical records, one could assume there was none.
Dr. Dabezies further testified if plaintiff had the Morelle-Lavalee lesion it would not have been unusual not to find some lesion on the skin for a period of time because the "process is emerging" In his opinion, Dr. Juneau met the standard of care for orthopedic surgeons in his treatment of Brian Smith.
A fact finder is not clearly wrong when the record contains evidence supporting a finding of fact. In the instant case, the record contains equally impressive medical evidence to support plaintiff's theory that his massive loss of skin tissue and muscle tissue was a foreseeable complication of having been immobilized in a pelvic sling for twelve days without having his skin inspected by anyone and/or not being provided with any relief from the pressure being placed on his buttocks by the pelvic sling. Plaintiff maintained his injury was a preventable decubitus.
Dr. Gerald Edward Liuzza, the Director of clinical pathology at Charity Hospital, now known as University Medical Center of New Orleans, was tendered and accepted as an expert in the field of pathology. He testified he viewed the medical records and tissue samples of plaintiff's buttocks given to him by Dr. Banta when plaintiff arrived at Charity Hospital. His conclusion was the tissue samples were "dead and dying and inflamed tissue from a decubitus ulcer".
Dr. McCready, Director of Anberry Rehabilitation Hospital in Atwater, California was tendered and accepted as an expert in the area of physical medicine and rehabilitation. Dr. McCready testified he treated Brian while he was in the Rehabilitation Institute at Charity from January 11, 1989 through May 25, 1989.
Dr. McCready opined that on admission to the Rehabilitation Institute in January of 89, plaintiff had a pressure ulcer or bedsore, and the ulcer was caused by excess pressure. He testified plaintiff's skin was not addressed in his treatment at Meadowcrest. In Dr. McCready's opinion, Dr. Juneau did not use reasonable diligence in caring for plaintiff's skin while plaintiff was hospitalized at Meadowcrest Hospital. Dr. McCready testified Dr. Juneau should have ordered plaintiff's skin checked daily and if plaintiff was lying in bed, he should have issued orders to turn the patient every two hours from the time he came out of surgery at Meadowcrest until his discharge. In his opinion, it would be beneath the standard of care not to turn the patient every two hours. Further, it would be a deviation of the standard of care and treatment not to have periodically released the pressure of the pelvic sling in which plaintiff was confined.
Dr. Marvin Tile, an orthopedic surgeon who was educated and practices medicine in Canada testified by deposition. Dr. Tile testified he was knowledgeable of the standard of care practiced by orthopedic surgeons in the United States. He further testified the measures used by Dr. Juneau to treat Brian Smith's pelvic fracture contributed, in fact, to the ultimate loss of skin, tissue and muscle in the area of his buttocks. He testified the down side of using MAST pants or a pelvic sling was the risk of complications to the patient's skin and underlying tissues. He further testified if Dr. Juneau did not know the down sides and potential risks of using a pelvic sling or MAST pants, such lack of knowledge would have been below the standard of care of an orthopedic surgeon. According to Dr. Tile, measures should have been taken to minimize risks and complications of mast pants and pelvic sling. There was a need to be extremely careful and give follow-up care. There was also a need to inspect the area on a daily basis to see whether there was the beginning of pressure on the skin, so that skin problems could be addressed.
Dr. Tile testified he reviewed the medical records from Meadowcrest and found no documentation of measures being taken to minimize the risk of complications from using this pelvic sling, nor did he find any evidence of daily inspections of the tissues under the sling. According to Dr. Tile, if Dr. Juneau did not order or institute these measures to prevent or minimize the risk of complications from using the pelvic sling, that failure constituted a departure from the *1372 expected standard of care. A significant chance of loss of skin, tissue and muscle from plaintiff's buttocks could have been prevented if Dr. Juneau had instituted a program of careful monitoring and observation of his buttocks.
The record contains no testimony or medical documentation to support a finding Dr. Juneau considered instituting an inspection program of the plaintiff's skin within the pelvic sling. Indeed, Dr. Juneau admitted he gave no orders to inspect the patient's skin, as he felt it was contraindicated. His number one priority was to stabilize the pelvis and if plaintiff had been moved, it would have increased the risk of internal bleeding and the patient could have died. Yet, Dr. Juneau also testified he was sure the nurses checked plaintiff's skin. However, Nancy Dempsey and Catalina Co, two of the nurses who attended plaintiff while he was being treated at Meadowcrest Hospital, testified no inspection was made of the area of skin under the sling because there was no order from the doctor allowing for such inspection. Both nurses stated it was contraindicated as the patient could not be moved. Dr. Juneau admitted he was unaware of the fact that the necrotic process was going on in plaintiff's skin on his buttocks at the time of the transfer to Charity. Medical records contain no notations of observations by anyone of plaintiff's skin under the sling until he arrived at Charity Hospital. Further there is no credible testimony to support a conclusion that the nurses ever made an attempt to observe plaintiff's skin under the sling.
For these reasons, we reject Dr. Juneau's argument that plaintiff failed to prove he met the applicable standard of care in his treatment of plaintiff. Dr. Juneau's theory that the pressure sores which plaintiff experienced most likely resulted from injury suffered by the impact of the accident was supported either wholly or in part by the testimony of Dr. Ruel, Dr. Dabezies, Dr. Charles Dupin, and Dr. Farris. However, plaintiff's theory that his pressure sores were decubitus ulcers caused by the failure to inspect the skin in the pelvic sling in which he was placed by Dr. Juneau was supported wholly or in part by the testimony of Dr. Liuzza, Dr. Davies, Dr. McCready and Dr. Tile.
The fact that some of the orthopedic surgeons testified plaintiff's injury was not a decubitus ulcer, but rather an internal injury occurring at the time of the accident does not negate the fact that the jury obviously decided to give more credence to the testimony of physicians in other specialties. In light of the testimony that the issue of skin care and cause of decubitus is not peculiar to the specialty of orthopedic surgery, but encompasses general knowledge possessed of all general physicians, we cannot say the jury committed manifest error when it chose to believe the testimony of physicians other than orthopedic surgeons in finding Dr. Juneau's treatment fell below the acceptable standard of practice.
The issue in this case was whether the proper skin care was given. Plaintiff presented sufficient evidence to support the jury's conclusion that proper skin care was not given, and as a result of the failure to properly care for the skin, plaintiff developed a decubitus ulcer. Dr. Juneau never inspected plaintiff's skin under the sling, never recognized a developing problem with the skin and tissue of plaintiff's buttocks, and more importantly never ordered the nurses or any other workers at the hospital to check the skin under the sling. This assignment of error has no merit.

Dr. Juneau's Assignment of Error 2
In his second assignment of error, Dr. Juneau argues the jury was clearly wrong or manifestly erroneous when it found the alleged deviation caused injury or damage to plaintiff, Brian Smith.
"Whether there exists a causal relationship, between the alleged negligent treatment and the injury sustained, is a determination of fact which should not be reversed on appeal absent manifest error." Wainwright v. Leary, 623 So.2d 233, 235-236 (La. App. 2d Cir.), writ denied, 629 So.2d 1127 (La.1993), citing Martin v. East Jefferson General Hosp., 582 So.2d 1272 (La.1991).
Testimony on this issue was also contradictory. While it is true Dr. Juneau and members of the medical review panel opined the *1373 damage caused to plaintiff's buttocks was predetermined by the accident, other witnesses testified the injury to the buttocks was a decubitus ulcer caused by prolonged pressure from being in the pelvic sling, and not having been turned while in the sling. Dr. Liuzza was adamant in his belief the tissue samples confirmed the injury was a decubitus ulcer. We find causation was proven. Thus this assignment of error has no merit.

Dr. Juneau's Assignment of Error 3
In his third assignment of error, Dr. Juneau argues the trial court erred by allowing testimony from Dr. H. Clinton McCready, a specialist in physical rehabilitation medicine, regarding the standard of care of Dr. Juneau, an orthopedic surgeon.

Admissibility of Dr. McCready's Testimony
Prior to trial of the case plaintiff filed a motion in limine seeking an order allowing the testimony of Dr. H. Clinton McCready, a physician who practices in physical medicine and rehabilitation with respect to the failure of Dr. Juneau and other physicians to meet the applicable standard of care with respect to the skin care of plaintiff while he was at Meadowcrest General Hospital. The trial court denied plaintiff's motion and ruled the testimony of Dr. McCready regarding the deviation from the standard of care of Dr. Juneau and Dr. Schiro was to be excluded from evidence. Plaintiff filed an application for supervisory writs. This Court granted plaintiff's writ application and ordered the trial court to allow Dr. McCready to testify. Citing McLean v. Hunter, 495 So.2d 1298 (La.1986) and Soteropulos v. Schmidt, 556 So.2d 276 (La.App. 4th Cir.1990), this Court stated the fact that the expert testifying does not practice in the same specialty area as the defendant medical providers is not grounds for exclusion of the testimony. This Court further opined that the instant case involved the issue of whether defendants negligently allowed plaintiff to develop a particularly severe form of the condition commonly called a "bed sore". This issue, said the Court does not involve "issues peculiar to the particular medical specialty involved which is surgery. Prevention of bed sores, as Dr. McCready points out, is common to all forms of medical treatment." However, on application for rehearing, this Court recalled its previous order and denied the plaintiff's writ application. Plaintiff sought supervisory writs from the State Supreme Court. The Supreme Court granted plaintiff's writ application and ruled Dr. McCready should be allowed to testify. That decision is now the law of the case and the matter is not subject to any further review by this Court. Dodson v. Community Blood Center of Louisiana, Inc. 633 So.2d 252, 255-256 (La.App. 1st Cir.1993), writs denied, 93-3158 (La.3/18/94), 634 So.2d 850; 93-3174 (La.3/18/94), 634 So.2d 851; Buillard v. Davis, 195 La. 684, 197 So. 273, (1940). Defendants present no compelling reason for this Court to revisit this issue, particularly in view of the fact that the Louisiana Supreme Court ordered the trial court to allow Dr. McCready to testify.
Considering that the record adequately supports a finding that the issue of skin care is not peculiar to any one specialty, any qualified physician could testify concerning the standard of care to be exercised by an orthopedic surgeon caring for a patient. Further, Dr. McCready did not testify concerning the standard of care in an area peculiar to the specialty of orthopedic surgeons, but only the standard of care as to skin care. Consequently, the trial court did not err in allowing Dr. McCready's testimony on this issue.

Dr. Juneau's Assignment of Error 4
In his next assignment of error, Dr. Juneau argues the trial court erred by allowing testimony from Dr. Albert Davies, a specialist in internal medicine, who was not a treating physician.

Admissibility of Dr. Davies' Testimony
For the reasons previously enunciated in the discussion concerning the testimony of Dr. McCready, we find no merit to this assignment of error. Additionally, Dr. Davies was also a specialist in critical care and or trauma patients and also testified the area of skin care of such patients was one within the province of general medicine. As such, almost *1374 any physician could testify concerning the issue.

Dr. Juneau's Assignment of Error 5
In his final assignment of error Dr. Juneau argues the trial court erred in allowing rebuttal and/or impeachment testimony by a paralegal when plaintiff failed to lay a proper foundation as required by La. C.E. art. 613 concerning alleged prior inconsistent statements of Dr. Dabezies.

Admissibility of Rebuttal Testimony
During the course of the trial Dr. Dabezies, a defense witness, was called to testify during the presentation of plaintiff's case. Dr. Dabezies was allowed to testify early as a courtesy to accommodate his schedule.
Plaintiff's attorney questioned Dr. Dabezies extensively on cross-examination, after which plaintiff resumed calling the rest of his witnesses and then rested. However, after the defense had called all its witnesses to testify, plaintiff's counsel informed the court they wished to call Lynn Gee, a paralegal at the law firm of Lewis & Kullman as a rebuttal witness.[3]
Ms. Gee testified that as a paralegal of Lewis & Kullman, she was involved in handling the case of Brian Smith. She scheduled a conference with Dr. Dabezies in February, 1989, and sent him all of Brian Smith's medical records from Meadowcrest to review. She, along with Larry Kullman of the firm, was present at a conference held at Dr. Dabezies' office in Metairie, Louisiana to discuss Brian Smith's case. When asked what Dr. Dabezies said during the conference regarding whether or not malpractice was committed with regard to the treatment of Brian Smith at Meadowcrest Hospital, Ms. Gee replied:
Dr. Dabezies said he was very upset about what had happened to Brian at Meadowcrest. He said that they just didn't treat Brian, that they let him lie there waiting for a bed at Charity Hospital. He said if they weren't going to operate on his pelvis there at Meadowcrest, they should have gotten him somewhere where he could have gotten the surgery. He said that had they operated on his pelvis at Meadowcrest, Brian would have been up and out of the hospital within two weeks of that surgery. He said that Brian also would have gotten, he would have been able to get the knee surgery sooner had he gotten the pelvic surgery at Meadowcrest. He said ... at Meadowcrest, they should have checked the skin and they could have checked the skin. He and they could have checked the skin. He suggest, well, he told us that we should find the writings of Dr. Marvin Tile. Dr. Marvin Tile had written on prompt treatment of such pelvic fractures and we did get those writings and in fact Dr. Tile became our expert. He said that this was clearly a case of medical malpractice and that we should win the case and on that basis we proceeded with the case. He said that he and Dr. Juneau were good friends. Dr. Juneau was a former student of his and for that reason he did not want to become overtly involved in this case. And he said that if, if we ever put him on the stand and asked him to repeat what he had said that day, he would deny it.
Ms. Gee further testified she never, on behalf of Lewis & Kullman ever attempted to retain Dr. Dabezies as an expert in this case. When asked why they did not attempt to retain Dr. Dabezies, she replied:
Because number one, Dr. Dabazies (sic) told us he did not want to become openly involved in the case. Dr. Dabazies and Mrs. Dabezies are long time friends of Mr. Lewis of our firm. Dr. Dabezies has always been a friend of where I work. We were going to honor his request. Number two, if we were not going to honor his request and we would put him on the stand, he would deny what he said. He told us he would deny what he told us that day.
The method for impeaching a witness via a challenge to credibility is found in La. C.E. art 613 which provides:
Art. 613. Foundation for extrinsic attack on credibility

*1375 Except as the interests of justice otherwise require, extrinsic evidence of bias, interest, or corruption, prior inconsistent statements, conviction of crime, or defects of capacity is admissible after the proponent has first fairly directed the witness' attention to the statement, act, or matter alleged, and the witness has been given the opportunity to admit the fact and has failed distinctly to do so.
Plaintiff clearly failed to follow the provisions of this codal article prior to calling Ms. Gee to testify. The only testimony plaintiff attempted to use as foundation for Ms. Gee's testimony, which unquestionably called into question Dr. Dabezies' credibility, was the following exchange which occurred when plaintiff's counsel questioned Dr. Dabezies on cross examination:
Q. Doctor, has you (sic) opinion with regard to the cause of Mr. Smith's injuries on his backside ever changed?
A. Has it ever changed? Yeah, I think it probably has as we have gone on ... and I think recently it has changed with the, my recent experience and this paper that has described it and sent literature and the problem was the same then as it is now and I think what we see is real, is really an impact degloving injury.
Q. So your opinion changed basically some six years later?
A. Oh, I think it changed before that.
Q. Five?
A. Probably within the first year or two, because there were several conversations with various people about this and I think that what was initially thought was probably not accurate.
Nowhere does plaintiff ask Dr. Dabezies whether he made the various statements attributed to him by Ms. Gee, particularly the statement he would deny saying this was malpractice. Clearly under art. 613, the impeachment was not performed correctly. For this reason, the trial court erred in allowing the impeachment without the laying of a proper foundation.

De Novo Review of Dr. Juneau's Liability
Because the trial court erred in allowing impeachment evidence without the laying of a proper foundation, this Court will conduct a de novo review. The testimony offered by the experts concerning the issue of Dr. Juneau's liability has been summarized in the earlier part of this opinion. Having reviewed all the testimony, we find plaintiff clearly proved medical malpractice by a preponderance of the evidence. In reaching this conclusion, we take notice of the following additional facts in the record.
The position taken by Dr. Juneau was internally inconsistent. On one hand, he adamantly maintained it was necessary for plaintiff to remain immobile in the pelvic sling because he ran the risk of causing more internal bleeding if he was moved. According to Dr. Juneau, it was necessary to keep plaintiff immobile to "save his life". Yet, on the other hand, Dr. Juneau testified he assumed the nurses inspected plaintiff's skin when they log rolled him and/or changed his linen.
There was significant testimony to the effect that plaintiff was still in danger of bleeding, and when he removed the sling himself during the earlier part of his stay, he experienced a drop in his blood count and had to be given more blood. However, the charts indicate that plaintiff was log-rolled by the nurses and apparently none of the physicians issued any orders to cease this activity. More importantly, immediately upon plaintiff's arrival at Charity, Nurse Kerry Allain was able to examine his skin and discover the decubitus without any untoward effects. It would appear that even if it was necessary to keep plaintiff immobile during the earlier part of his stay at the hospital, his condition must have stabilized at some point prior to his arrival at Charity since the nurse at Charity was able to inspect the skin. Thus the argument that movement would have caused plaintiff to die is not supported by the evidence. Even Dr. Dabezies, a witness for Dr. Juneau, admitted it was fair to say that at some point during plaintiff's stay in Meadowcrest somebody needed to take a look at the area confined within the sling.[4]
*1376 Dr. Juneau's testimony that the nurses inspected plaintiff's skin is not supported by any evidence and is not convincing. The fact remains Dr. Juneau gave the nurses no written orders whatsoever as to what movement, if any, was allowed. Significantly, Dr. Lane testified that it was a violation of the standard of care for the nurses to log-roll plaintiff without an order to begin with. If movement was contraindicated, Dr. Juneau should have said so, and should have had a discussion with the nurses concerning the log-rolling. It is undisputed that he failed to do either.
The testimony of Dr. Dupin, a physician on the staff at Meadowcrest, must be considered in light of the fact Dr. Dupin never treated plaintiff, but only looked at records. Even so, Dr. Dupin admitted there is little in the record to say whether plaintiff's buttocks were looked at while he was a patient at Meadowcrest, and further that nobody can say exactly how plaintiff's skin looked upon departing for Charity.
Dr. Farris' testimony concerning the injury not being a decubitus was severely undercut by his admission that in a deposition taken a month prior to trial he answered no to the question, "If you say microscopically, can you exclude decubitus from necrosis versus some other cause."
More importantly however, even without the impeachment evidence, it is questionable the jury would have given much credence to Dr. Dabezies' testimony. Dr. Dabezies taught the resident orthopedists at Charity, and Dr. Juneau was one of his students. They remained acquaintances over the years and he consulted with him occasionally as he did in this case.
The medical records show plaintiff was seen by at least eleven physicians at Charity, who referred to the injury as some type of decubitus. Notwithstanding the fact he believed this was a degloving injury, Dr. Dabezies, who taught residents in orthopedic surgery at Charity and was supervising the care of orthopedic patients at Charity as well at the time the plaintiff was being treated at Charity, had no explanation for why the various physicians who examined plaintiff while he was at Charity repeatedly referred to plaintiff's injury as a decubitus. Nor could he adequately explain why nowhere in the medical records at Charity was this injury called a degloving injury. When asked why in the seven months while plaintiff was in Charity none of the other doctors changed the diagnosis of decubitus, Dr. Dabezies replied "I don't know why." Such an admission is puzzling in view of the fact Dr. Dabezies was the supervising physician.
We find no significant inconsistences in the testimony of plaintiff's experts concerning their reasons for believing the injury was a decubitus, caused at least in part by a failure to inspect plaintiff's skin underneath the sling while he was a patient at Meadowcrest Hospital. For this reason, we find plaintiff established that Dr. Juneau failed to meet the standard of care required of orthopedic surgeons for treating plaintiff.

NME's assignment of Error 1
In its first assignment of error NME Hospitals, Inc d/b/a/ Meadowcrest Hospital argues a de novo review of the record is required since the trial court erred in allowing rebuttal testimony from Lynn Gee. In our earlier discussion of Dr. Juneau's assignment of error 5, we specifically found the trial court erred in allowing the impeachment without the laying of a proper foundation. Consequently, this assignment of error has merit.

De Novo Review of the liability of Meadowcrest Hospital
The burden imposed upon a plaintiff in a medical malpractice action is essentially the same as the burden imposed on a plaintiff in any negligence case. See Austin v. St. Charles General Hosp., 587 So.2d 742 (La. App. 4th Cir.), writ denied, 590 So.2d 80 (La.1991) wherein we stated:
In a medical malpractice action against a hospital, the plaintiff must prove, as in any negligence action, that the defendant *1377 owed the plaintiff a duty to protect against the risk involved, that the defendant breached that duty, that the plaintiff suffered an injury, and that the defendant's actions were a substantial cause in fact of the injury. (citation omitted)
Id. at 746.
Having reviewed the entire record, we conclude plaintiff presented adequate proof to establish Meadowcrest Hospital breached the standard of care required of hospitals in this medical malpractice case.
Dr. Patricia Lane was recognized as an expert in nursing. Dr. Lane testified that in her opinion the care given by the nurses at Meadowcrest Hospital "was below the standard of care". Dr. Lane testified there should have been a skin care plan for plaintiff. Dr. Lane stressed the importance of the doctor and nurses working together to insure the skin was inspected regularly and plans made to insure the integrity of the skin.
Dr. Lane stated plaintiff was a high risk patient for decubitus ulcers in that he was on bed rest and could not move from a position for a period of time. According to Dr. Lane, the skin of even a healthy person lying in the same spot for 12 hours can become red, and if there is no pressure relief, the skin can become an open sore at that point. The continuous pressure keeps circulation from getting to the area because it's compressed. In Brian Smith's case, immobility and restricted movement put him at risk.
Dr. Lane discussed the developmental stages of ulcers and described various measures nurses should take with respect to caring for the skin of patient's in traction. She concluded the nurses at Meadowcrest did not comply with the standards of care required in the treatment of Brian Smith's skin. She testified she had reviewed the medical records from Meadowcrest and there was no notation in plaintiff's chart concerning plaintiff being at high risk. Further, there was no notation concerning the potential for skin breakdown or a problem. Nor was there a plan that indicated some problem solving had taken place to attempt to relieve the pressure.
Dr. Lane also thought it was significant that there was no documentation of the skin on admission and no documentation he was in an egg crate mattress to help decrease the pressure. She stated air fluid beds like a Clinitron bed can decrease the pressure for somebody who is going to be in traction for a long term. This item, according to Dr. Lane, was available, at least in the flow sheet. According to Dr. Lane, it was important for the nurses to find out from the doctor how soon the patient could turn. Although plaintiff had an overhead trapeze, there was no notation of teaching him to lift up every hour. Such a practice could have partially relieved the pressure.
Dr. Lane noted there was no notation about skin care in general nor about care to the area under the sling. There was no notation that the area was observed during his 10 days at Meadowcrest Hospital, nor was there any evidence of an investigation after complaints of discomfort.
Dr. Lane further noted when plaintiff got out of traction on his own there was no notation the nurses checked his back side at that point to see why he was so uncomfortable, even though he had said he was very uncomfortable a number of times and it had been documented in the chart. There was no notation of any plan by nurses at Meadowcrest Hospital as to how they were going to deal with his buttocks that were under tremendous pressure. Dr. Lane testified, "It would not be a nursing decision though to decide to move a patient, to get him you know, to turn him. It would be a medical decision so that they would need to check with the doctor on that." However, she noted there was no notation of them [the nurses] asking the doctor when he could be moved.
She noted the records reflected after a week in traction the nurses started log-rolling him without a doctor's order. According to her, they should have had a doctor's order, but once started if they were going to turn him it made sense that they would also look and see, pull the sling back and look at it at the same time. Yet, there was no notation about the buttocks being observed during that period of time.
*1378 According to Dr. Lane it was a violation of the standard of care 1) just to ignore the area under the sling, 2) not to have a plan for prevention of problems or 3) not to ask what can be done at that point. She also stated that once the patient was stabilized, good skin care should be given at a minimum once or twice a shift. Further, plaintiff could have been coached or taught to lift up on the trapeze more often. He needed pressure relief at least every two hours. Dr. Lane further testified that good nursing practice would have required the nurse to first look at the skin when the notation made in the chart concerning the dark foul odor ten days into plaintiff's stay in the hospital was made. Alternatively, if the skin was not inspected, the existence of the foul odor should have been reported to the doctor. Generally when you transfer a patient to another unit you don't transfer them soiled. If they had a bowel movement, you clean them up. Dr. Lane noted several procedures of Meadowcrest hospital which the nurses did not follow. First, the nurse is responsible for assessing the major body system including integumentary, which would include the skin. This means the nurse was to assess and inspect the skin and tell what needed to be done to determine potential or actual problems. Second, the nurse was to "plan, intervene and evaluate." Dr. Lane found no documentation to establish this was done in relation to the skin underneath sling. Medical records contained no documentation of any assessment or plan for skin care. Additionally, the nurse was to report unusual incidents, circumstances, or problems of the patient to the doctor. This would apply in terms of the nurse seeing the drainage through the sling at a time when the patient was running fever. This would also require reporting of the incident wherein the patient threw the traction weights on the floor and was out the sling. Dr. Lane stated it would seem that when the nurses attempted to give the enema, they would have inspected plaintiff's buttocks.
Dr. Lane also noted there was a problem with communications between the nurses and the doctors while plaintiff was in traction. She reiterated there was nothing keeping the nurses from asking whether plaintiff could lift using an overhead trapeze or whether they could turn plaintiff to look at his skin once his condition stabilized. The nurses needed to know how much movement and lifting was allowed. While conceding not every thing said between doctor and nurses goes on chart, Dr. Lane emphasized the fact that the important things should be on the chart.
The evidence clearly establishes the nurses never inspected plaintiff's skin under the sling. Both Nurse Dempsey and Nurse Co testified the sling was not moved since there were no orders from the doctor allowing for movement. Neither nurse offered any explanation for asking the doctor what movement was allowed nor for the failure to have a skin care plan. Nor did the nurses ask the doctor about skin care. More importantly, Nurse Co testified she noticed a foul odor emanating from underneath the right side of the sling under the right hip in the early morning hours of October 27, while she was giving plaintiff a bed bath. She documented her observations in the medical records, but did not investigate the source of the odor or summons a doctor or nurse to further investigate. When asked if she told anyone about the odor, she replied, "I can't be very sure" and further stated that she could not remember if she even mentioned it to any nurse on the same shift.
In light of Dr. Lane's testimony concerning the necessity for the doctor and nurse to communicate concerning skin care for a patient in traction, it is clear both the doctor and nurses breached the standard of care in caring for plaintiff's skin. Further, the evidence supports a conclusion the culpability of the nurses was greater than that of Dr. Juneau in that 1) there was testimony from the plaintiff he complained about the sling being uncomfortable to the nurses and the nurses indicated the matter would be discussed with the doctor, but this apparently never occurred; 2) although at least one nurse documented the foul odor coming from the area under the sling, the nurse did not specifically call this matter to the doctor's attention, and 3) in the absence of any orders concerning skin care, the nurses never inquired of the doctor concerning skin care for the area under the sling. Since the nurses *1379 were engaged more in the day to day care of the skin, the doctor could reasonably assume any problems with the skin would be called to his attention by the nurses, but this did not occur.
The evidence also leads us to conclude the resultant loss of tissue in the buttocks, the area under the sling, was caused by this breach of the standard of care. Notwithstanding the foul odor emanating from under the sling on October 27, nobody at Meadowcrest examined the area under the sling prior to shipping the plaintiff off to Charity on October 28. Within hours of arriving at Charity, plaintiff was examined by Nurse Kerry Allain. Nurse Allain testified she remembered plaintiff vividly. She recalled he had been transferred overnight and he appeared very ill upon his arrival at Charity. He had a temperature and was in pain. She further testified she examined him from "head to toe" and he had some type of fixation device on him, but she could not recall the sling still being there. She further testified she "did notice an odor at this time coming from somewhere that I couldn't see". When she examined his backside, she discovered "[H]e had a decubitus on his buttocks that was large. It smelled terrible. He looked very dirty, which I was just real surprised coming from Meadowcrest that he,(sic) it looked like he hadn't been cleaned and that area hadn't been, nothing had been done to it ever."[5] Nurse Allain notified the physician as the nurses were not sure where plaintiff's temperature was coming from and Nurse Allain also thought the physician would want to see the area.
When the physicians came to examine plaintiff at Charity, they immediately began debriding the area at bedside, but ultimately concluded the area needing debriding was too large, and that further treatment of the area would be delayed to a later date. This was the first of numerous debridement procedures plaintiff would undergo because of the condition of his buttocks. The immediate observation of the condition upon arrival at Charity, coupled with the admitted failure to ever examine the skin at Meadowcrest leads to the inescapable conclusion this failure to examine most likely was the cause of the development of the decubitus on plaintiff's buttocks. At the very least, even failure to examine the area of the skin underneath the sling undoubtedly contributed to plaintiff's condition worsening. Thus both breach of the standard of care and causation was established by plaintiff.

NME's Assignment of Error 2
In its next assignment of error, NME argues the trial court erred in allowing the admission of plaintiff's exhibits 10A through 10F when no witness was on the witness stand to authenticate these photographs and the photographs were highly prejudicial and cumulative.

Admissibility of Photographs
At the beginning of trial, just after each side gave its opening statement, counsel for plaintiff requested permission to approach the bench. At a bench conference held before the judge, plaintiff's counsel indicated photographs taken of plaintiff during the course of his stay at Charity Hospital and additional photographs taken recently would be offered into evidence during the course of trial. Counsel for plaintiff informed the court defendants had informed them they did not have any objection to foundation. Rather the only objection was as to the "inflammable nature of the picture (sic)". For that reason plaintiff's counsel stated they wished to introduce the photographs at that time so defendants could make their objections. Counsel for plaintiff represented to the court the first two pictures were representations of the plaintiff taken during the course of his stay in Charity over the period that he went through the debridement procedures and the beginning of the grafting.
Counsel for Meadowcrest responded to the introduction of these two photographs stating:
... We have an objection to both of these. Number one, Your Honor, we do *1380 have an objection with respect to the fact that it's our belief and understanding that this patient developed a subsequent decubitus ulcer while in Charity and I don't know if these photographs depict that or not. So on that point I have an objection.
The second point of the objection, this is after surgical intervention. This is an open cut wound. This is not what he looked liked after Charity. This is obviously after and the donor grafts have been taken from the patient's leg and these photographs are inflammatory, the prejudicial value outweighs the probative value.
Plaintiff's counsel responded to this objection by stating 1) the pictures constituted an accurate depiction of what was going on with plaintiff over a long period of time; 2) if the photographs inflame the jury, they did so only because plaintiff's injuries were so severe and the photographs were being introduced because they accurately depict his condition in a way that words alone could not do; and 3) plaintiff was at risk for developing another decubitus because of his original injuries, and he was continuously debrided from the time he got to Charity through the end of November. After hearing these arguments the trial court stated the treatment itself was a part of the damage he had sustained and was relevant on the damages issue and the photographs were admissible on the issue of damages. When asked if defendants had any other objection, counsel stated he had the same objections and when asked if there was an objection to foundation, counsel replied "Yes, same objections." The court replied, "Okay, if he's going, if they are going to object to the foundation, then you need to put your witness on and lay the foundation." Counsel for plaintiff advised the court the pictures would have to be introduced probably at the time they introduced Dr. McCready's deposition.
During Dr. McCready's testimony, counsel for plaintiff interrogated Dr. McCready concerning several of the photographs. At the time plaintiff's counsel sought to introduce the photographs into the record, plaintiff's counsel stated:
At this time, the plaintiff will offer, file and introduce into evidence Plaintiff's Exhibit 10-A, B, C, D, E, F, H and I, which are photographs of Brian Smith. For the record, A, B, C, D, E, and F were taken on April 25th, 1989. H and I were taken on July 5th, 1994 and at the conclusion of the day, we will ask that the jury view the photographs.
When asked if defendants had any objections to the photographs, defendants answered "None other than that we have already stated." Whereupon the trial court ruled the photographs would be admitted.
"Photographs are generally admissible if they illustrate any fact, shed any light upon an issue in the case, or are relevant to describe the person, thing or place depicted." State v. Harvin, 437 So.2d 983, 986 (La.App. 3d Cir.1983). The test for determining the admissibility of allegedly gruesome photographs is whether their probative value outweighs any inflammatory effect. Day v. South Line Equipment Co., 551 So.2d 774 (La.App. 1st Cir.), writ denied, 553 So.2d 474 (La.1989). The photographs admitted into evidence depict plaintiff's injuries at various stages of development. While some of the photographs are unpleasant, they are not necessarily inflammatory. They clearly are relevant to the issue of damages. We find no error in the trial court's determination that, notwithstanding any allegations of the inflammatory nature of the photographs, the photographs had probative value on the issue of damages. For this reason, the trial court correctly overruled the objection premised upon the prejudicial or inflammatory nature of the photographs.
Having reviewed Dr. McCready's deposition and the reference to photographs, we also find plaintiff did in fact lay a proper foundation for the admission of the photographs. In his testimony, Dr. McCready identified plaintiff lying in a Clinitron bed with a trapeze bar above him. He also identified a photograph of plaintiff lying on his back with a colostomy bag on the right side of his stomach. He noted in this photo plaintiff has a large surgical scar there, probably two feet long, two and a half feet where the sutures have been removed, and on his right hip, he has another large surgical scar that looks like it's healing well. He identified *1381 other photographs of plaintiff that illustrated or showed his progress. Additionally, when plaintiff testified, he identified many of the same pictures as well.
Viewing the entire record, we do not find the trial court erred in admitting the photographs into evidence.

NME's Assignment of Error 3
In its next assignment of error NME argues the trier of fact committed manifest error in ruling for plaintiff when plaintiff failed to prove by a preponderance of the evidence Meadowcrest Hospital breached the standard of care owed to plaintiff, and that the breach caused plaintiff damages he otherwise would not have incurred.
In our earlier discussion of NME's first assignment of error we determined, after making a de novo review of the evidence, plaintiff presented sufficient evidence to establish Meadowcrest Hospital also breached the standard of care while providing treatment to plaintiff. Additionally, in our discussion of Dr. Juneau's assignment of error 2, we found plaintiff's injury was in fact a decubitus cause by a failure to relieve pressure. Consequently, a discussion of this assignment of error is unnecessary.

LPCF's Assignment of Error 1
In its first assignment of error, intervenor, Louisiana Patient's Compensation Fund Oversight Board argues the trial court erred in amending the judgment of November 22, 1994, substantively on December 22, 1994, thus making the December 22, 1994, judgment an absolute nullity.
Plaintiff originally filed his petition for damages in December of 1990. In August of 1991, the Louisiana Department of Health and Hospitals, on behalf of Charity Hospital of Louisiana filed its petition of intervention seeking $135,595.26 for medical supplies and services rendered to plaintiff. Attached to its petition was an itemized bill in the amount of $135,595.26 and an affidavit of the correctness of the bill signed by Miles Trapolin, attorney for Charity Hospital.
Attached with the computer printouts is a detailed bill dated 9/11/89 listing admission date of Brian Smith as 1/1/89, showing an estimated amount due as of that time as $45,624.85 and principal, along with several diagnostic descriptions, including that of "decubitus ulcer". Meadowcrest, Dr. Juneau, and his insurer filed an answer to the intervention in August of 1991.
During the trial of the case Joyce Dugais, an accounting specialist employed by Charity Hospital, testified concerning the medical bills incurred by plaintiff as a result of his treatment at Charity. Ms. Dugais testified she had been asked to review all the records and to delete all bills not related to decubitus ulcer treatment. After reviewing all the records she determined that for Charity, plaintiff had an initial bill for $101,399.11. From that figure, she subtracted $8,375.45.[6] These were for charges that were unrelated to a decubitus ulcer. She then ended up with a total of $93,023.66.
In jury interrogatory # 8(I), the jury was to determine what amount of money damages would compensate Brian Smith for his past medical expenses. The jury decided $94,000 would compensate plaintiff for his past medical expenses.
Notwithstanding this finding, and the filing of an intervention by Charity, the trial court neglected to award this amount to Charity when it signed the original judgment of November 22, 1994. However, on December 21, 1994, the trial court sua sponte signed an amended judgment granting judgment in favor of the intervenor, Charity Hospital in the amount of $94,000 for medical expenses, payable by the Louisiana Patient's Compensation Fund, along with judicial interest as provided by law.
Assuming arguendo the trial court erred, the error occurred when the trial court issued the original judgment and inadvertently failed to granted Charity the relief sought. This error was corrected when the trial court issued the amended judgment. Consequently, the issue of whether the changes made by the amended judgment constitute substantive *1382 changes is irrelevant. Up until the signing of the amended judgment, the case, at least as to Charity had been tried, but no definitive ruling on Charity's claim had been made. Thus, in actuality, although the judgment was properly termed an amended judgment, the judgment was really the original judgment as to intervenor, Charity. Given the fact that all parties to the litigation knew Charity had filed an intervention and, more importantly, the evidence clearly supports the award of $94,000 for medical expenses, we cannot say the trial court erred in amending the judgment to grant this amount to Charity.

LPCF's Assignment of Error 2
In its next assignment of error the intervenor argues the trial court erred by making duplicative awards, thus requiring the general damages award to be reduced to $450,000.
In this assignment of error Intervenor complains the awards for permanent disability, scarring and permanent disfigurement, and past loss of enjoyment of life totalling $650,000 are duplicative of the more general awards for past physical pain and suffering, past mental and emotional pain and suffering, and future mental and emotional pain and suffering totalling $450,000. Thus the duplicative awards totalling $650,000 should be reversed.
Implicit in intervenor's argument that the award for permanent disability, scarring and permanent disfigurement and past and future loss of enjoyment of life are duplicative of the more general awards for past and future physical and mental pain and suffering is an assumption the trial court committed error by requiring the itemization of these elements of damages. Plaintiff maintains this argument cannot be considered on appeal because none of the defendants objected to the jury interrogatories requiring itemization of damages as required by La. C.C. P. art. 1793.
La. C.C. P. art. 1793 provides in relevant part:
C. A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter to which he objects and the grounds of his objection....
Pursuant to this codal provision, a party may not assign as error the giving of an instruction unless he objects thereto and states the grounds for his objection before the jury retires. Citing St. Pierre v. General American Transp. Corp., 360 So.2d 595 (La.App. 4th Cir.), writ denied 362 So.2d 1386 (La. 1978), the court in Levet v. Calais & Sons, Inc., 514 So.2d 153, 157 (La.App. 5th Cir. 1987), noted that the requirement that an objection be lodged before the jury retires has been extended to interrogatories and the failure to do so constitutes a waiver of objections, provided the parties were given an opportunity to object. Since none of the named defendants objected to the jury interrogatory which required the jury to itemize damages, plaintiff argues this assignment of error cannot be considered by this Court. We disagree.
The LPCF was not a named defendant. Nor does the record contain any evidence to support a finding LPCF had notice of this litigation prior to the rendition of judgment. Trial of this matter was held on September 27, 28 and 29 and October 2,3,4, and 5 of 1994. The jury answered the interrogatories on October 4, 1994, and the trial court entered its original judgment on November 22, 1994. Between the time the jury answered the interrogatories and the trial court signed the original judgment plaintiff, on October 17, 1994, filed a motion to reduce jury verdict to judgment. In that motion plaintiff averred the $500,000 cap on general damages mandated by La. R.S. 40:1299.42(B)(1) was unconstitutional under the Constitutions of the United States of America and the State of Louisiana. In response to that motion, the Louisiana Patient's Compensation Fund filed its petition of intervention on November 18, 1994, alleging that it had a right to intervene pursuant to La. R.S. 40:1299.44(D)(2)(a) which empowers the Board to defend the Louisiana Patient's Compensation Fund and La. C.C. P. art. 1091 which permits a third person having an interest in a pending action to intervene in order to protect that interest. The LPCF alleged it wished to intervene "for *1383 the purpose of presenting argument on the issues of the constitutionality and the meaning of La. R.S. 40:1299.42(B)."
Prior to the filing of plaintiff's motion to make the judgment of the jury the judgment of the court, the record contains no evidence to suggest the LPCF had ever been served with notice of the existence of this litigation. Consequently, it appears the LPCF did not become aware of the existence of this litigation until after the case had been tried.
More importantly, pursuant to this Court's ruling in Payne v. New Orleans General Hosp., 611 So.2d 777 (La.App. 4th Cir.1992), the LPCF had no standing to intervene in the matter until settlement or judgment in excess of $100,000 had been rendered. Consequently, since the LPCF had no standing to intervene during trial of the case, LPCF had no opportunity to object to the jury instructions. For this reason, this Court is of the opinion the provisions of La. C.C.P. art. 1793 are not applicable to LPCF as 1) they were not parties to the litigation at the time the objection could have been made and 2) they had no opportunity to object to the jury interrogatory. Consequently, the LPCF is not prohibited from challenging the damages awarded pursuant to the jury interrogatories.

Validity of the Amended Judgment
The jury returned a verdict on the interrogatories set up by the court and not objected to by any of the defendants as follows:
What amount of money damages do you find would compensate Brian Smith for his:

A. Past physical pain and
 suffering $100,000
B. Future physical pain and
 suffering $100,000
C. Past mental and emotional
 pain and suffering $100,000
D. Future mental and emotion
 (sic) pain and suffering $150,000
E. Permanent disability $200,000
F. Scarring and permanent
 disfigurement $250,000
G. Past loss of enjoyment of
 life $50,000
H. Future loss of enjoyment
 of life $150,000
I. Past medical expenses $94,000
 Total $1,194,000,000 (sic)

In support of the argument compensation for loss of enjoyment of life is included in an award for past and future mental and physical pain and suffering, intervenor relies upon a statement made by this Court in Koepp v. Sea-Land Service, Inc., 93-2562 p. 16 (La. App. 4 Cir. 11/17/94), 645 So.2d 1269. In that case this court stated:
The plaintiff is entitled to receive compensation for the physical effects which impair his ability to engage in life enjoying activities; plaintiff is also entitled to receive compensation for the mental effects which impair his ability to engage in life enjoying activities. Plaintiff is not entitled to receive compensation for physical and mental effects of the injury plus compensation for loss of enjoyment of life, for loss of enjoyment of life constitutes the basis for the physical and mental components.
LPCF maintains that adherence to the view that loss of enjoyment of life constitutes the basis for the physical and mental components dictates the award of $100,000 for past physical pain and suffering and $100,000 for past mental and emotional pain and suffering is duplicative of the $50,000 for past loss of enjoyment of life. Similarly, LPCF maintains the $100,000 award for future physical pain and suffering and $150,000 for future mental and emotional pain and suffering is duplicative of the $150,000 award for future loss of enjoyment of life.
However, defendants' reliance upon Koepp v. Sea-Land Service, Inc., supra, for the view that such awards are always duplicative is misplaced for two reasons. First, Koepp v. Sea-Land Service, Inc. was a maritime case and this Court relied upon federal cases applicable to maritime cases. This is not a maritime case, and the issue of whether the damage award was duplicative, and thus excessive is to be determined by State law. Loss of enjoyment of life may be included within a category of general damages; however, it is not necessarily duplicative of physical and mental pain, anguish, past and future, and any permanent disability. See Richard v. Teague, 92-17 (La.App. 3 Cir. 5/4/94), 636 So.2d 1160, writ denied, 94-1934 (La.11/11/94), 644 So.2d 388.
In State Through Dept. of Social Services on Behalf of Harden v. Southern Baptist *1384 Hospital, et al., 94-2228 and 94-2229 (La. App. 4 Cir. 10/12/95), 663 So.2d 443, writ denied, 95-2751 (La.1/26/96), 666 So.2d 676, this Court recognized the importance of examining the entire record prior to determining whether a separate award for "enjoyment of life" is duplicative of an award for past and future mental anguish. In that case, this Court found that a $415,000 award for "loss of enjoyment of life" and a $150,000 award for "past and future mental anguish" was not duplicative where it was clear from the jury charge and interrogatories that the loss of enjoyment of life award was really for loss of consortium. Having examined the entire record of this case, including plaintiff's closing argument, the jury interrogatories, and the instructions to the jury, we find no evidence to support a distinction between enjoyment of life and mental anguish. Clearly, plaintiff did not assert any claim for loss of consortium.
No distinction was made by plaintiff's counsel in closing argument. Rather, in closing argument plaintiff asked the jury to award him $200,000 for pain and suffering, and later asked for a total award of $600,000 including pain and suffering, his disability and the horrible scars and disfigurement plus the medical expenses due for his stay at Charity Hospital. Again at the end of closing argument plaintiff asked for a total award of $693,000. Plaintiff repeatedly talked about his damages strictly in terms of the pain and suffering he had and would continue to endure, the disfigurement caused by the scarring, and the various losses he was experiencing because of his failure to engage in various activities.
In the instructions to the jury, the trial judge told the jury how to determine damages, but provided no explanation of the differences in the various elements of damages listed in the jury interrogatories. Rather, the trial judge stated:
... In determining an award for general damages, you are vested with much discretion. By the phrase general damages, we mean a sum of money which you feel would fairly compensate the plaintiff for the pain, suffering, mental anguish, disability, scarring, loss of lifestyle that the plaintiff has suffered or may suffer in the future.... Actual damages resulting from a wrongful act are not limited to pecuniary laws (sic). They extend to the mental and physical suffering which the injured party sustained or will sustain. Mental suffering may occur through worry, fear and exist (sic) a concern over the incident and the way plaintiff's condition will affect his or her life. Mental suffering may also result from distress or anguish called (sic) by deprivation due to the accident or injury.
Because the record contains no evidence to substantiate a finding that loss of enjoyment of life comprised a separate distinct element of damages from the general categories of past and future physical and mental suffering, the separate award for loss of enjoyment of life must be deleted from the general damages award.
LPCF also argues the jury's award of $200,000 for "permanent disability" should also be reversed as duplicative of the award for past and future physical and mental suffering. LPCF bases this argument that plaintiff was not seeking economic losses through his lawsuit on the following statement made by plaintiff's counsel:
Now, he may go get a job. No one is asking you to pay him for wages lost. He is going to earn a living. He will go to work and he will go home, what else is he going to do? Is he going to have a wife and kids; not right now, he is not. Is he going to live a normal life where he can go to the movies or go to the shopping center or to the Saints games; not right now he is not. (Underlining added)
* * * * * *
Finally, disability. How is this disabling? He can go to work, but what else can he do? I don't think that he can do anything at this point. I don't know if he will be able to and I certainly know Dr. McCready is right. If it happens again, he is going to be worse. He is not going to be better. This may be the best he ever gets and we are not talking about somebody whose had the opportunity to live their life, someone whose had the opportunity to get *1385 married and raise children and go forward with a career. We are talking about a guy who was robbed, all of it was taken away because when this happened, he was only twenty-three. It was all taken away. Again, I am going to ask you for $200,000.
LPCF argues that the above quotes support a finding plaintiff is seeking to recover the very same damages he sought to recover through his past and future physical and mental pain and suffering and not economic damages. We disagree.
The fact that plaintiff did not seek lost wages does not mean that he suffered no economic losses because of his disabling condition. Plaintiff testified that although he has reached the stage where he is walking, he must stop every now and then, and he cannot sit without shifting his weight often. He must use a cushion for his chairs.
Dr. McCready testified plaintiff will have more decubitus ulcers because of the breakdown of the skin. He testified when he last treated plaintiff he used a cane and/or walker. He was in pain and had trouble standing, walking, and sitting.
He further testified plaintiff was only able to walk short distances. He limps and is pretty much in pain with every step. Further Dr. McCready testified losing one's major muscle, the gluteus maximus, causes disability. This is the largest muscle in the buttocksone on the left and one on the right, and this muscle helps with ambulation. According to Dr. McCready, "He [plaintiff] will have problems with ... walking, standing, sitting probably the rest of his life. He will get ulcers in his gluteal region in the future because the skin is not as strong. It does not have the same blood supply. In the future he'll break down again."
This type of disability will necessarily limit plaintiff's job possibilities and will undoubtedly affect his ability to earn the kind of money he may have been able to earn prior to becoming disabled. For this reason, the award for permanent disability is not duplicative of the awards for past and future physical and mental suffering.
Finally LPCF argues the jury award of $250,000 for scarring and disfigurement is also duplicative as the courts have made it clear that disfigurement and scarring has as an integral part of their substance the mental pain and anguish that accompany such disfigurement and scarring. We agree. See Day v. South Line Equipment Company, 551 So.2d 774, 778 (La.App. 1st Cir.) writ denied, 553 So.2d 474 (La.1989). Consequently this $250,000 award must also be deleted from the judgment.
Accordingly, the $50,000 award for past loss of enjoyment of life, the $150,000 award for future loss of enjoyment of life, and the $250,000 award for scarring and disfigurement must be deleted from the general damages award. Deleting these amounts from the general damages awards would result in a general damages award of $650,000. In light of the fact the trial judge, in conformity with the statutory cap imposed by the provisions of La. R.S. 40:1299.42(B)(1), only awarded plaintiff $500,000 in general damages, the judgment of the trial court is affirmed.
AFFIRMED.
NOTES
[1] Dr. John Schiro and Dr. Michael Friley, general surgeons, were also named as defendants in the initial petition. Both physicians were dismissed from the litigation prior to trial.
[2] Dr. Liuzza was an expert witness for plaintiff.
[3] Lewis & Kullman was the law firm representing plaintiff, Brian Smith.
[4] However Dr Dabezies testified he did not believe the ultimate responsibility remained with the doctor who put him in the sling; rather, he testified the nurses who were log rolling him had an obligation to point out a problem.
[5] On cross-examination Nurse Allain admitted that calling the area a decubitus was a medical diagnosis which she as a nurse was not allowed to make. The correct observation should have been "skin breakdown."
[6] The orthopedic surgery to his fractured pelvis and his associated stay for that injury amounted to $8,375.45.